Robin K. Perkins, SBN 131252
Christopher F. Wohl, SBN 170280
**WOHL SAMMIS & PERKINS LLP**
1006 4th Street, Fourth Floor
Sacramento, California 95814
Telephone: (916) 446-2000
Facsimile: (916) 447-6400

Attorneys for Defendants,
MATTHEW J. HEWITT and
PACIFIC CREST RESEARCH CORPORATION

SEALED

FILED

APR 2 5 2005

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

COMMUNICATIONS CENTER, INC.

    Plaintiff,

v.

MATTHEW J. HEWITT, and PACIFIC
CREST RESEARCH CORPORATION

    Defendants.

**CASE NO. CIV-S-03-1968 WBS KJM**

**DEFENDANTS' OBJECTIONS TO MAGISTRATE**

**JUDGE'S FINDINGS AND RECOMMENDATIONS**

**UNDER SEAL—DO NOT OPEN**
**WITHOUT COURT ORDER**

WOHL
SAMMIS
&PERKINS LLP
ATTORNEYS AT LAW
1006 4ᵗʰ St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax   (916) 447-6400

- i -

# TABLE OF CONTENTS

**Page**

**I.    INTRODUCTION** ...................................................................................................1

**II.    STATEMENT OF RELEVANT FACTS** ............................................................2

    **Relevant Procedural History** .................................................................................9

**III.    ARGUMENT** ......................................................................................................16

    **A.    Standard of Review** ...................................................................................16

    **B.    Hewitt Did Not Intentionally Violate Magistrate Mueller's May 20, 2004 Discovery Order and the District Court is Respectfully asked to Reject the Magistrate's Recommended Decision** ....................................................17

    **C.    Entry of Default is an Extreme Remedy That is Rarely Appropriate** ...............19

        **(1)    The Public's Interest in Expeditiously Resolving This Case has Not Been Effected** ...........................................................................20

        **(2)    The Court's Need to Manage its Docket** ....................................20

        **(3)    CCI Has Not Been Prejudiced** ...................................................21

            **(a)    CCI Has Not Been Prejudiced Because it has Already Been Determined that None of the "Clients" That CCI Claims Hewitt Unlawfully Solicited Support CCI's Claim** ........................21

                **1.) *Kiley & Company Fired CCI*** ...........................................21

                **2.) *Socratic Technologies Fired CCI*** ...................................22

                **3.) *Selzer & Company Fired CCI*** .........................................23

                **4.) *CCI Consented to Hewitt's Solicitation of Anzalone Liszt Research*** ...............................................................................23

                **5.) *CCI Consented to Hewitt's Solicitation of Binder Research*** .........23

                **(b)    There is No Prejudice to CCI Because Even If Hewitt Possessed Evidence that CCI Assumes is in Existence CCI Still Cannot Prevail in this Case** ....................................................................24

WOHL
SAMMIS
&PERKINS LLP
ATTORNEYS AT LAW
1006 4th St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax   (916) 447-6400

1.) *Default is Unwarranted as to CCI's Claim for Misappropriation of Trade Secrets.* ...................................................................25

2.) *Default Judgment Should Not Be Entered Against Hewitt on CCI's Claim for Tortious Interference with Prospective Economic Advantage* ..........................................................................26

3.) *Default Judgment Should Not Be Entered Against Hewitt on CCI's Claim for Unfair Competition* ...............................................29

4.) *Default Judgment Should Not Be Entered Against Hewitt on CCI's Claim for Conspiracy* ............................................................30

5.) *Default Judgment Should Not Be Entered Against Hewitt on CCI's Claim for Illegal Interception of Communications* ...............31

6.) *Default Judgment Should Not Be Entered Against Hewitt on CCI's Claim for Breach of Confidentiality Agreement* .................33

7.) *Default Judgment Should Not Be Entered Against Hewitt on CCI's Claim for Breach of Fiduciary Duty* ....................................33

8.) *Default Judgment Should Not Be Entered Against Hewitt on CCI's Claim for Breach of Confidence* ..........................................34

(4)  **Public Policy Favors the Disposition of this Case on its Merits** ..........34

(5)  **Less Drastic Sanctions are Available** .....................................................35

a.)  **Magistrate Mueller Never Forewarned Hewitt Default Was Possible** ...............................................................................35

b.)  **Magistrate Mueller Did Not Implement Alternative Sanctions Before Ordering Default Against Defendants** ...........................36

c.)  **Magistrate Mueller's Reliance on Anheuser Busch, Inc. in Deciding Against Less Drastic Sanctions is Distinguished From the Instant Case** .................................................................37

(i)  *Less Drastic Sanctions Against Hewitt are Available* ...........38

D.  **Only "Reasonable" Attorney's Fees and Costs Should be Considered—The $145,811.75 Claimed by CCI is Clearly Excessive and Unreasonable** ...............41

IV.  **CONCLUSION** ....................................................................................................45

WOHL
SAMMIS
&PERKINS LLP
ATTORNEYS AT LAW
1006 4ᵗʰ St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax    (916) 447-6400

# TABLE OF AUTHORITIES

1

2
**Pages**

3
## Cases

4

5
Adriana Int'l Corp. v. Thoren, 913 F.2d 1406 (9th Cir. 1990)................................21, 35, 36, 37

6
Anheuser Busch, Inc. v. Natural Beverage Distributors et al. (9th Cir. 1995)
   69 F. 3d 337 ....................................................................................................35, 37, 38

7
Applied Equipment Corp. v. Litton Saudi Arabia Ltd.  (1994) 7 Cal.4[th] 503 .........................30

8
Arntz Contracting Co. v. St. Paul Fire & Marine Ins. (1996) 47 Cal.App.4[th]  464...................27

9

10
Bed, Bath & Beyand v. La Jolla Village Square Venture Partners (1997)
   52 Cal.App.4[th] 867.......................................................................................................27

11

12
Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co. (1999)
   20 Cal 4th 163 ............................................................................................................29

13

14
Consumers Union of United States, Inc. v. Fisher Development, Inc. (1989)
   208 Cal.App.3d 1433......................................................................................................29

15

16
Della Penna v. Toyota Motor Sales, USA, Inc., 11 Cal.4th 376,
   45 Cal.Rptr.2d 436, 902 P.2d 740 (1995)...........................................................................26

17
Exxon Valdez, 102 F.3d 429 (9th Cir. 1996) ........................................................19

18

19
Faris v. Enberg (1979) 97 Cal.App.3d 309, 321 ......................................................34

20
Fjelstad v. American Honda Motor Co., Inc., 762 F.2d 1334 (9th Cir.1985) ..........................20

21
Gemini Aluminum Corp. v. California Custom Shapes, Inc. (2002) 95 Cal.App.4th 1249 ....27

22
Gibson-Homans Co. v. Wall-Tite, Inc 1992 WL 512411(C.D. Cal.)......................................26

23
G-K Properties v. Redevelopment Agency, 577 F.2d 645 (9th Cir. 1978) ..............................19

24
Goldstein v. Hawaii Medical Service Ass'n, D.Hawai, 297 F.Supp.2d 1259 (2003)...............16

25

26
In Re Yagman 796 F.2d 1165 (9th Cir.1986)........................................................................42

27
Insurance Corp. of Ireland, 456 U.S. 694 (1982) .................................................................16

28
Konop v. Hawaiian Airlines, Inc. 302 F.3d 1068 (9th Cir. 2002)............................................31

WOHL
SAMMIS LLP
&PERKINS LLP
ATTORNEYS AT LAW
1006 4ᵗʰ St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax   (916) 447-6400

- iv -

Korea Supply Co. v. Lockheed Martin Corp. (2003) 29 Cal.4[th] 1134 ............ 29, 38, 39, 40, 41

Kucala Enterprises v. Auto Wax Company, Inc., 2003 U.S. District Lexis 19103 ................. 39

Malone v. U.S. Postal Service, 833 F. 2d 128 (9th Cir. 1987) ........................................ 1, 20, 34

National Med. Transp. Network v. Deloitte & Touche, 62 Cal.App.4th 412 (1998) ............. 27

Pennar Software Corp. v. Fortune 500 Sys., 2001 U.S. Dist. LEXIS 18432, 51 Fed.R.Serv.3d
    (Callaghan) 279 ......................................................................................................... 20

People v. McKale (1979) 25 Cal.3d 626 .................................................................................. 29

Pierce v. Lyman (1991) 1 Cal.App.4th 1093 ........................................................................... 33

Sebastian Internat'l v. Russolillo, 128 F.Supp.2d 630 (C.D.Cal. 2001) ................................... 27

Shepherd v. ABC, 62 F.3d 1469 (D.C. Cir 1995). .................................................................. 20

Tele-Count Engineers, Inc. v. Pacific Tel. & Tel. Co. (1985) 168 Cal.App.3d 455 ................ 34

Toth v. Trans World Airlines, Inc., 862 F.2d 1381 (9th Cir. 1988) ................................... 41, 42

Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp., 982 F.2d 363 (9th Cir. 1992) ......... 16

United States of America v. Kahaluu Construction Co, Inc.
    857 F.2d 600 (9th Cir. 1988 ........................................................................... 35, 36, 37

Valley Engineers Inc. v. Electric Engineering Co., 158 F.3d 1051 (9th Cir. 1998) ..... 16, 21, 35

Wanderer v. Johnston 910 F2d 652 (9th Cir 1990) ................................................................ 20

Williams v. Alioto, 625 F.2d 845 (9th Cir. 1980) ............................................................. 41, 42

Wyatt v. Union Mortgage Co. (1979) 24 Cal.3d 773 ............................................................... 30

Wyle v. R.J. Reynolds, 709 F.2d 585 (9th Cir. 1983) .............................................................. 19

## Statutes

18 U.S.C. § 2701(a)(1) ............................................................................................................ 32

28 USC § 636 ...................................................................................................................... 1, 2

Cal. Civil Code § 3426.1(b) .................................................................................................... 25

California Business and Profession Code section 17200 .......................................................... 29

WOHL
SAMMIS
&PERKINS LLP
ATTORNEYS AT LAW
1006 4th St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax   (916) 447-6400

1
2

**Rules**

3

Federal Rules of Civil Procedure Rule 72 (b) ........................................................................ 16

4

Federal Rules of Civil Procedure, Rule 37 ........................................................................ 16

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

WOHL
SAMMIS
&PERKINS LLP
ATTORNEYS AT LAW
1006 4ᵗʰ St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax    (916) 447-6400

# I.    INTRODUCTION

On April 5, 2005 United States Magistrate Judge Kimberly J. Mueller issued an Order with Findings and Recommendations that:  (1) proposes striking the Answer of Defendants Matthew J. Hewitt ("Hewitt") and the company he founded Pacific Crest Research Corporation, Inc. ("Pacific Crest"); (2) recommends that default be entered against Defendants; and (3) suggests that Defendants pay $145,811.75 in attorney's fees and costs claimed to have been incurred by Plaintiff's counsel in this pre-trial discovery matter.    Defendants object to Magistrate Mueller's Findings and Recommendations pursuant to 28 U.S.C. 636.

At issue in this pretrial discovery dispute is whether Hewitt intentionally and in bad faith violated Magistrate Mueller's discovery order requiring Hewitt to produce "mirror" images of certain computer hard drives.  CCI alleges that Hewitt used a software application to overwrite *potentially* relevant information from his computer hard drives.  While Hewitt[1] acknowledges using poor judgment by attempting to remove irrelevant and embarrassing information from his computer hard drives he denies destroying any evidence or violating Magistrate Mueller's prior order.  It is not disputed that CCI cannot identify a single relevant document that was withheld or destroyed by Hewitt.

As discussed in <u>Malone v. U.S. Postal Service,</u> 833 F. 2d 128, 130 (9th Cir. 1987) five factors are used to determine if default for violating a court order is appropriate: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the [opposing party]; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions."  Applying the five <u>Malone</u> factors to Hewitt's conduct does not call for default as proposed by Magistrate Mueller.  First, Hewitt's error in judgment will not delay the August 9, 2005 trial date and therefore the "public's interest in expeditious resolution of litigation" remains intact.  Second, Hewitt's conduct has not affected the court's ability to manage its docket.  Third, CCI has not been prejudiced because no relevant information was destroyed, because CCI has deposed

---

[1] Hewitt, who at 37 years of age and who has never been a party to litigation, was never previously warned by Magistrate Mueller that dismissal was a possibility if he removed from his computer hard drive previously deleted information, *infra*.

WOHL
SAMMIS
&PERKINS LLP
ATTORNEYS AT LAW
1006 4th St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax    (916) 447-6400

1 and/or obtained evidence from each of the five "clients" that it alleges were unlawfully solicited

2 by Hewitt, and because CCI's claims (even if they had evidentiary support) against Hewitt

3 would fail as a matter of law (*infra*).    Fourth, there is a strong "public policy favoring

4 disposition of cases on their merits" which will only happen if Magistrate Mueller's Findings

5 and Recommendations are rejected by this Court.  Finally, there are "lesser sanctions" available

6 which would sufficiently punish Hewitt while still allowing this case to be decided on the

7 merits.

8          Pursuant to 28 USC § 636 this Honorable Court is respectfully asked to: (1) reject

9 Magistrate Mueller's recommendation that Defendants' Answer be stricken; (2) reject

10 Magistrate Mueller's recommendation entering default against defendants; and (3) reject as

11 grossly excessive and unreasonable the recommendation awarding $145,811.75 in attorney's

12 fees and costs to CCI.

## II. <u>STATEMENT OF RELEVANT FACTS</u>

14          CCI and Defendant Pacific Crest are market research and data collection companies

15 which are sometimes referred to as "call centers" or "phone banks."  They are staffed by large

16 numbers of employees that are akin to telemarketers.  The "callers" are given questions (i.e., the

17 "survey") from the client.  With the "survey" in hand the callers obtain answers to the questions

18 by randomly dialing persons with listed telephone numbers.  Hewitt was hired by CCI President

19 Bob Schleifer in May of 1999 to supervise CCI's Spokane, Washington data collection call

20 center.  Hewitt was never asked or required to sign a "non-compete" agreement or anything that

21 would prevent him from competing against CCI.  (Exhibit F, Yesnick Depo, 49:14-18, attached

22 to Declaration of Robin Perkins, Esq., which is attached hereto as Exhibit 1.[2])

23          During his employment CCI provided Hewitt with a laptop computer to use at home and

24 at work.  Because CCI allowed Hewitt to use the laptop for business and personal use it

25 contained not only business-related information but also Hewitt's personal and private

26 information including banking and financial transactions, Internet histories and emails.  CCI

27

28 [2]In a separate pleading Hewitt seeks judicial notice of Exhibits A-Q attached to the Declaration of Robin K. Perkins, Esq., which was filed on November 17, 2004 in support of Defendants' Opposition to CCI's motion for default.  (FRE 201) To simplify, the Perkins' Declaration will be referred to herein as Exhibit 1 with each exhibit attached thereto also identified.

WOHL
SAMMIS
&PERKINS LLP
ATTORNEYS AT LAW
1006 4th St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax   (916) 447-6400

1  does not maintain any written policies regarding the use of its computers. (Exhibit B, Hewitt

2  depo, p. 138:14-19, attached to Declaration of Robin Perkins, Esq. [Exhibit 1])

3      On July 7, 2000 CCI President Schleifer promoted Hewitt to Director of Operations of

4  the Spokane call center.  The terms of Hewitt's promotion were memorialized in a two-page

5  letter prepared by Schleifer.  Hewitt was given an increase in salary and bonuses if he met

6  certain performance goals. (Exhibit M, attached to Declaration of Robin Perkins, Esq., [Exhibit

7  1])

8      On January 2, 2001 CCI President Schleifer again promoted Hewitt, this time to the

9  position of Director of National Operations.  (Exhibit O, attached to Declaration of Robin

10 Perkins, Esq., [Exhibit 1]) Hewitt was now charged with overseeing the two CCI call centers—

11 one in Spokane the other in Lakeland, Florida.  The terms of Hewitt's promotion were

12 memorialized in single-page letter prepared by Schleifer.  Hewitt was given an increase in

13 salary and bonuses if he met certain performance goals. (Exhibit N, attached to Declaration of

14 Robin Perkins, Esq., [Exhibit 1])

15     On June 10, 2002 Hewitt was moved into the position of Account Executive after he and

16 his wife moved to Northern California to accommodate Mrs. Hewitt's transfer to Travis Air

17 Force Base in Fairfield.  (Exhibit B, Hewitt depo, 116:1-21, attached to Declaration of Robin

18 Perkins, Esq., [Exhibit 1])

19     On September 27, 2002 Hewitt's employment with CCI ended.  Hewitt was unhappy as

20 an Account Executive and wanted to return to what he did best, running a call center.  Although

21 Hewitt was involuntarily separated he and CCI parted on good terms.  In fact, CCI President

22 Schleifer told Hewitt in a farewell letter: "I wish you the best in your future endeavors and

23 earnestly hope that you learned not only from this experience, but from you (sic) entire tenor

24 (sic) with us".  Hewitt returned his company-issued laptop computer, a fax machine and other

25 CCI property.  (Exhibit B Hewitt depo, 186:25, 187:1-22, attached to Declaration of Robin

26 Perkins, Esq., [Exhibit 1])  As other CCI employees had done before turning in their laptops

27 Hewitt reformatted the laptop's hard drive to remove information that would be considered

28 personal and private such as Hewitt's Internet histories, emails between friends and family, and

WOHL
SAMMIS
&PERKINS LLP
ATTORNEYS AT LAW
1006 4th St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax    (916) 447-6400

- 3 -

1   his banking and financial information. (*Id.* 189:12-25, 190:1-22) Hewitt did this because CCI

2   had a pattern and practice of reviewing Internet histories and other private information

3   contained on their employees' computers once they left CCI. Hewitt also knew that this

4   personal and private information was shared with other CCI employees including Schleifer and

5   Lawson. (*Id.* at 190:11-25, 191, 192)

6          After leaving CCI Hewitt attempted but was unable to find a job. (Exhibit B, Hewitt

7   depo, 196:1-5, attached to Declaration of Robin Perkins, Esq., [Exhibit 1]) Hewitt borrowed

8   money from family and credit card companies to pay his bills. (*Id.* at 196:6-24) Hewitt's

9   friends and family encouraged him to think about starting his own data collection business. (*Id.*

10  at 197:6-22) Hewitt began looking at options to finance a small business, considering a Small

11  Business Administration loan and other financing options. (*Id.* at 197:6-22) Hewitt's father-in-

12  law gave him business advice including the recommendation that Hewitt should first

13  incorporate his new company before doing anything else. (*Id.* at 198:21-25, 199:1-7)

14         In December of 2002 Hewitt told CCI President Schleifer he was thinking about starting

15  his own data collection company. (Exhibit D, Schleifer depo, 164:13-20, attached to

16  Declaration of Robin Perkins, Esq., [Exhibit 1]) Hewitt asked for and received Schleifer's

17  business advice. (*Id.* at 163:17-22, 164:1-8) Schleifer told Hewitt he needed to think like an

18  "entrepreneur"; Schleifer explained that Hewitt needed to set a budget and then stay within that

19  budget; and, Schleifer told Hewitt that Pacific Crest should not try to be like CCI overnight. (*Id.*

20  at 186:4-22, 187:1-10; Exhibit A, Komatsu depo, 21:7-25, 22:1-14, attached to Declaration of

21  Robin Perkins, Esq. [Exhibit 1]) Schleifer admits that he wanted Hewitt and Pacific Crest to

22  "succeed" because CCI stood to profit from Pacific Crest's success. (Exhibit D, Schleifer depo,

23  168:1-22, 169:1-9, attached to Declaration of Robin Perkins, Esq., [Exhibit 1])

24         Schleifer continued in 2003 to consult with Hewitt on how to get Pacific Crest up and

25  running. (Exhibit D, Schleifer depo, 166:11-22, 167, 168:1-17, 174:9-22, 175, 176, attached to

26  Declaration of Robin Perkins, Esq., [Exhibit 1] For example, Schleifer told Hewitt how to and

27  make his first payroll. (*Ibid.*) Schleifer explained how Hewitt's computer network and

28  telephone system should be set up. (*Ibid.*) Schleifer told Hewitt what kind of computer

WOHL
SAMMIS
&PERKINS LLP
ATTORNEYS AT LAW
1006 4th St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax   (916) 447-6400

- 4 -

1   "timekeeping system" Pacific Crest should use. (*Ibid.*)  Schleifer explained to Hewitt the kind

2   of "data processing facility" Pacific Crest needed to run.  (*Ibid.*)  Schleifer told Hewitt that

3   Pacific Crest should adopt a particular data processing "methodology" including a system

4   designed to "process the information and put it in a format" for the client. (*Ibid.*)  Schleifer

5   recommended different types of software, servers, and phones that Hewitt needed for Pacific

6   Crest.  (*Ibid.*)  Schleifer also gave Hewitt advice on setting up a "cost structure" for Pacific

7   Crest. (*Id.* at 168:9-16.)

8       Schleifer was not the only CCI executive that helped Hewitt and Pacific Crest.  Steve

9   Lawson, CCI's "Chief Technical Officer"[3], acted as a paid consultant for Pacific Crest. (Exhibit

10  E, Lawson depo, 54:3-17, attached to Declaration of Robin Perkins, Esq., [Exhibit 1])  It is

11  undisputed that while employed by CCI, and with CCI's consent, Lawson literally put Pacific

12  Crest "in business" by performing the following tasks:  Lawson set up and configured Pacific

13  Crest's computer network; Lawson installed Pacific Crest's telephone dialing system; Lawson

14  set up the Pacific Crest's "entire interviewing floor"; Lawson even provided Pacific Crest with

15  CCI's "algorithms"[4]; Lawson "instructed [Hewitt] on how to review the survey and put the

16  codes back in;" Lawson helped Hewitt unscramble "tar" files; and he installed the Quancept[5]

17  "CATI" phone dialing software onto Pacific Crest's Sun System server.  (Exhibit B, Hewitt

18  depo, 223:2-11, 275:22-25; 276, 277:1-3, 433, 437:3-9, Exhibit G, Prather depo, 24:7-19;

19  Exhibit D, Schleifer depo, 219:9-10, 224:21-22, 225, 226:1-20; Exhibit E; Lawson depo, 11:6-

20  14, 15:21-25, 16:1-18, 23:7-25, 24:1-4, 25:3-14, 27:8-25, 28-33:1-24, 39:2-19, Exhibit C,

21  Clinton depo, 47:16-22, 48:1-16;  Exhibit A, Komatsu depo, 31:25, 32, 33:1-5; all attached to

22  Declaration of Robin Perkins, Esq., [Exhibit 1])

23      CCI's Lawson also admits that he "detailed the different network requirements and

24  different schema" for Pacific Crest.  Lawson concedes that the work he did for Pacific Crest

25  was important for a start-up data collection business like Pacific Crest.  (Exhibit E, Lawson

26

[3] Lawson is a CCI Director and Shareholder.

27  [4] Prather describes algorithms as "a file that is used to control howling is done or what happens to a sample record while dialing."  (Prather depo, 25:10-20, Exhibit G to Declaration of Robin K. Perkins, Esq. Exhibit 1.)

28  [5] Most "call centers" like CCI and Pacific Crest use the "CATI" (i.e., the "Computer Aided Telephone Interviewing") software application manufactured by "Quancept". (Schleifer depo, 38:6-18, Hewitt depo, 214:9-11, attached as Exhibits D and B to Declaration of Robin K. Perkins, Esq., attached hereto as Exhibit 1)

WOHL
SAMMIS
&PERKINS LLP
ATTORNEYS AT LAW
1006 4th St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax   (916) 447-6400

- 5 -

1   depo, 15:21-25, 16:1-18, attached to Declaration of Robin Perkins, Esq., [Exhibit 1]) Hewitt

2   paid Lawson $50 per hour for his work. (Exhibit B, Hewitt depo, 274:22-24, attached to

3   Declaration of Robin Perkins, Esq., [Exhibit 1]) The advice and assistance that Schleifer gave

4   to Hewitt was very useful; however, Lawson's technical expertise and assistance actually put

5   Pacific Crest in business. (Exhibit B, Hewitt depo, 275:22-25; 276:1-4, attached to Declaration

6   of Robin Perkins, Esq., [Exhibit 1])

7          Pacific Crest did not just receive help from CCI President Schleifer and their technology

8   guru (Lawson). After learning from Schleifer that Hewitt started his own data collection

9   business, and with Schleifer's encouragement, CCI's top Programmer Dave Prather also began

10  doing some work as a paid consultant for Pacific Crest. (Exhibit G, Prather depo, 14:20-23,

11  15:19-25, 16:1-4, 17; Exhibit A, *supra*; Komatsu depo, 21:21-25, 22-24; attached to Declaration

12  of Robin Perkins, Esq., [Exhibit 1]) Like the advice he gave to Hewitt, Schleifer also told

13  Prather that he needed to think like an "entrepreneur" by working for CCI and also working as

14  an independent consultant for Pacific Crest. (Exhibit G, Prather depo, 23:17-25, 24:1-6; Exhibit

15  A, Komatsu depo, 21:7-14;  Exhibit D, Schleifer depo, 186:4-17, attached to Declaration of

16  Robin Perkins, Esq., [Exhibit 1])  Prather knew that Lawson worked as a Pacific Crest

17  consultant; he thought it was "cool" that CCI allowed Lawson to even share CCI's "algorithms"

18  with Pacific Crest. (Exhibit G, Prather depo, 15:19-25, 16:1-4, 24:13-21, 25, attached to

19  Declaration of Robin Perkins, Esq., [Exhibit 1]) With CCI's consent Prather configured Pacific

20  Crest's programming system to closely resemble the system used by CCI. (Exhibit E, Lawson

21  depo, 50:21-6; Exhibit A, Komatsu depo, 34:9-20, attached to Declaration of Robin Perkins,

22  Esq., [Exhibit 1])

23          CCI President Schleifer knew that CCI would profit from Pacific Crest's success by

24  outsourcing its overflow work to Pacific Crest. (Exhibit D, Schleifer depo, 170:17-22, 171,

25  172; Exhibit A, Komatsu depo, 24:21-25, 25-28:1-22; Exhibit E, Lawson depo, 11:6-14,

26  attached to Declaration of Robin Perkins, Esq., [Exhibit 1].) Schleifer understood that Pacific

27  Crest would be a "great place to outsource work" because Pacific Crest operated at a much

28  lower margin. (Exhibit A, Komatsu depo, 25:9-21, 26:6-25, 27:1-16, 28:1-22; Exhibit D,

WOHL
SAMMIS
&PERKINS LLP
ATTORNEYS AT LAW
1006 4th St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax   (916) 447-6400

- 6 -

1  Schleifer depo 226:22, 227:1-13, attached to Declaration of Robin Perkins, Esq., [Exhibit 1])

2  Hewitt welcomed the chance to work with CCI and never thought of Pacific Crest as a

3  "competitor" of CCI's but rather an outsourcing alternative. (Exhibit B, Hewitt depo, 437:10-

4  22, attached to Declaration of Robin Perkins, Esq., [Exhibit 1])

5      In addition to outsourcing work that CCI was too busy to handle CCI also referred work

6  to Pacific Crest for other reasons. For example, Schleifer wanted to give Pacific Crest some of

7  CCI's "high maintenance" clients such as Anzalone Liszt Research, IPSOS-ASI, BPP, and T &

8  S Intersearch. (Exhibit B, Hewitt depo, 297-299:1-20, 321:21-25; Exhibit A, Komatsu depo,

9  28:23-25, 29-33:1-20; Exhibit E,; Lawson depo, 11:6-14, attached to Declaration of Robin

10  Perkins, Esq., [Exhibit 1].) CCI also wanted Pacific Crest to perform work for Binder Research

11  because Hewitt and Binder were both located in northern California—about an hour from each

12  other. (Exhibit A, Komatsu depo, 29:8-22, attached to Declaration of Robin Perkins, Esq.,

13  [Exhibit 1]) CCI believed that referring Binder Research to Pacific Crest made sense because

14  CCI did not have a west coast client services manager and because CCI had problems servicing

15  west coast clients. (*Ibid.*)

16      After telling Hewitt to call on businesses that CCI did work for (including Binder

17  Research, Anzalone Listz, IPSOS-ASI) CCI also allowed Lawson and Prather to actually work

18  on some of these jobs for Pacific Crest (*even though they were employed by CCI*). (Exhibit B,

19  Hewitt depo, 273:18-25, 279:3-24, Exhibit E, Lawson depo, 4:4-25, 35:1-13, 36:15-25, 37, 38,

20  39:1, 40:13-23; Exhibit A, Komatsu depo, 34:9-21-25, 35, 36:1-20, 119:9-12;  Exhibit G,

21  Prather depo, 19:10-25, 20:1-17, 21:20-25, 22:1-10, attached to Declaration of Robin Perkins,

22  Esq., [Exhibit 1]) For example, CCI's Lawson programmed at least three Pacific Crest jobs for

23  Binder Research beginning in June of 2003. (Exhibit E, Lawson depo, 17:13-17; Exhibit B,

24  Hewitt depo, 279:3-25, 280:1-10, attached to Declaration of Robin Perkins, Esq., [Exhibit 1])

25  CCI Director of Client Services Jerry Karson also assisted Pacific Crest with Binder Research

26  jobs. (Exhibit D, Schleifer depo, 244:6-22, 245:1-8, attached to Declaration of Robin Perkins,

27  Esq., [Exhibit 1]) Schleifer even helped Pacific Crest by giving Jerry Karson job specifications

28  relative to Binder Research including "cost per interview" data. (*Id.* 244:6-22, 245:1-8) Pacific

WOHL
SAMMIS
&PERKINS LLP
ATTORNEYS AT LAW
1006 4th St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax    (916) 447-6400

- 7 -

1    Crest paid their CCI consultants Prather and Lawson $50 per hour for their work. (Exhibit B,

2    Hewitt depo, at 274:22-24, 435:16-17, attached to Declaration of Robin Perkins, Esq., [Exhibit

3    1])

4    Hewitt was grateful for all that Schleifer and CCI had done for him and Pacific Crest.

5    Hewitt showed his appreciation and thanked Schleifer in an email dated June 20, 2003.

6    Schleifer responded to Hewitt's email joking "I'm still gong to send you a bill when you make

7    some money." (Exhibit P, attached to Declaration of Robin K. Perkins, Esq., [Exhibit 1])

8    The amicable relationship between CCI and Hewitt ended when CCI's founder Wally

9    Clinton discovered that CCI had not only helped Hewitt but was also sending some CCI clients

10   to Pacific Crest. (Exhibit C, Clinton depo, 47:7-22, 48-52; 56:4-14; Exhibit Q, attached to

11   Declaration of Robin K. Perkins, Esq., [Exhibit 1])   Clinton was upset that Schleifer and

12   Lawson put Pacific Crest in business and helped Hewitt. (*Id.* at 49:3-6, 56:3-14; see also Ex Q,)

13   Clinton thought Schleifer and others at CCI used "horrible judgment" in allowing Lawson to

14   work as a Pacific Crest consultant. (*Id.* at 49:19-22.)   Clinton was also displeased when he

15   learned that Schleifer had actually given Hewitt permission to contact and solicit what CCI

16   referred to as their clients. (*Id.* at 52:5-20, 53:1-11.)

17   Schleifer knew Clinton was upset and tried to make amends.  In an August 6, 2003

18   email Schleifer admits to Clinton that he did not think there was anything wrong with helping

19   Hewitt to get Pacific Crest started. (Exhibit Q, attached to Declaration of Robin Perkins, Esq.,

20   [Exhibit 1])   Schleifer believed Hewitt would be a good source for overflow work but

21   apparently did not believe Hewitt could compete with CCI for business. (*Ibid*)   Schleifer told

22   Clinton he realized that he made a "mistake" by helping Hewitt, a mistake that Schleifer would

23   rectify. (*Ibid*)

24   CCI demanded that Hewitt and Pacific Crest cease doing business or litigation would

25   follow.  Hewitt refused to shut Pacific Crest's doors.  CCI filed this action on September 19,

26   2003.[6]  CCI's lawsuit is premised on the theory that Hewitt used CCI "trade secrets" obtained

27   while at CCI (i.e., CCI's client list, training materials, pricing information) to unfairly solicit

28

[6]In a separate pleading, the Court is respectfully requested to take judicial notice of the Complaint filed by CCI in this action.

WOHL
SAMMIS
&PERKINS LLP
ATTORNEYS AT LAW
1006 4th St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax   (916) 447-6400

1 and provide services for an identifiable cluster of CCI "clients": (1) Kiley & Company; (2)
2 Socratic Technologies (3) Anzalone Liszt Research; (4) Selzer & Company; and (5) Binder
3 Research. (Declaration of Robert Schleifer, ¶32, attached to CCI Motion for sanctions[7]). CCI
4 seeks damages for the income it claims it lost from these "clients." As shown below, these
5 "clients" were not unlawfully lured by Hewitt from CCI to Pacific Crest. To the contrary, some
6 of these companies made the decision to stop doing business with CCI before Pacific Crest ever
7 came into existence.

8 ## A. Relevant Procedural History

9      CCI served requests for production of documents in December 2003. However, CCI
10 President Schleifer stated in an email that he wanted to put a hold on litigation at least until
11 February 3, 2004—CCI's deadline for Hewitt to accept CCI's $50,000 settlement offer. Hewitt
12 would have paid the $50,000 settlement offer but would not agree to stop doing business for
13 two years, which was part of CCI's settlement demand. Although the discovery "hold" was
14 lifted it was agreed that no documents would be exchanged unless and until a Protective Order
15 was signed by the parties. Counsel for the parties worked on a proposed Protective Order,
16 which was signed by the Court on **February 11, 2004**. (See "Joint Statement Re Discovery
17 Disagreements" filed on or about April 30, 2004[8])

18      As soon as the Protective Order was signed Hewitt began producing documents to CCI.
19 In early March 2004 Hewitt also turned over to Capitol Digital Solutions ("CDS") a compact
20 disc ("CD") that contained thousands of documents and files from a Pacific Crest computer
21 hard drive. CDS was instructed to download all of the documents from the CD into paper form.
22 After they were reproduced into paper form Defendants' counsel would review them, determine
23 if any had to be classified as "Attorney's Eyes Only" pursuant to the Protective Order, have
24 them Bates-stamped, and then produced to Plaintiff. (See "Joint Statement Re Discovery
25 Disagreements" filed on or about April 30, 2004)

26

27

28

---

[7] In a separate pleading Defendants have asked that the Court takes Judicial Notice of CCI's Motion for Sanctions Including Default, the Declaration of Robert Schleifer, and all other supporting documents filed thereto.
[8] In a separate pleading Defendants have asked that the Court take Judicial Notice of the "Joint Statement Re Discovery Disagreements" and all supporting documents therein

WOHL
SAMMIS
&PERKINS LLP
ATTORNEYS AT LAW
1006 4th St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax  (916) 447-6400

- 9 -

1  CDS advised Defendants' counsel for the first time that that the CD contained more than
2  30,000 documents and files and that it would take several days just to reproduce the material.
3  Given the enormity of the job not to mention the cost, Defendants' counsel told CDS to stop the
4  download process so the issue could be broached with Plaintiff's counsel. Defendants' counsel
5  discussed the issue with Plaintiff's counsel. It was agreed that CDS would reproduce emails,
6  including emails between Hewitt and clients that CCI claimed Hewitt unlawfully solicited, see
7  *infra,* that those emails would be Bates-stamped, reviewed to determine if the "Attorney's Eyes
8  Only" designation would apply, and then produced to CCI's counsel. After production of the
9  emails it was agreed that counsel for the parties would discuss how to proceed with the
10 remaining production. (See "Joint Statement Re Discovery Disagreements" filed on or about
11 April 30, 2004)

12  On March 19, 2004 Defendants produced to Plaintiff about 4,000 documents identified
13 by Bates-stamp numbers DEF 1135-5040. On this date CCI's counsel was again informed that
14 Defendants' counsel Christopher Wohl, Esq., was in trial (in the matter of Milton v. California
15 Dept. of Heath Services, Sacramento Superior Court Case No. 01AS01353) and therefore
16 unavailable. CCI's counsel was advised that WOHL SAMMIS & PERKINS LLP associate
17 attorney Benjamin Fite, Esq. would be available to discuss discovery issues with CCI's counsel
18 while Mr. Wohl was in trial. (See "Joint Statement Re Discovery Disagreements" filed on or
19 about April 30, 2004)

20  On April 9, 2004 CCI's counsel was informed via facsimile that Ben Fite, Esq. had to
21 take an indefinite leave of absence because his infant son was suddenly stricken with a life-
22 threatening illness. Mr. Fite's son was scheduled to undergo emergency brain surgery in an
23 Oakland hospital that week. Because Mr. Fite would be out of the office indefinitely, because
24 Mr. Wohl was still in trial and therefore unavailable, and because Defendants' were producing
25 documents as quickly as possible, additional time to complete the production of documents was
26 sought from CCI's counsel. (See "Joint Statement Re Discovery Disagreements" filed on or
27 about April 30, 2004)

28

WOHL
SAMMIS
&PERKINS LLP
ATTORNEYS AT LAW
1006 4th St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax   (916) 447-6400

- 10 -

On April 21, 2004 Defendants provided Plaintiff with documents identified by Bates-stamp number DEF 5041-5255, a 500-page "AMA" directory and 660 pages of "Quirk's" research information that Plaintiff had requested. Plaintiff was <u>also</u> provided with (1) Hewitt's Supplemental Responses to Special Interrogatories; (2) Pacific Crest's *Second* Supplemental Responses to Special Interrogatories; (3) Hewitt's *Second* Supplemental Responses to Request for Production of Documents; <u>and</u> (4) Pacific Crest's *Second* Supplemental Responses to Request for Production. (See "Joint Statement Re Discovery Disagreements" filed on or about April 30, 2004)

In addition to Mr. Wohl's trial conflict, the serious illness to Mr. Fite's son, CCI's counsel was also advised that Mr. Wohl was expecting the birth of his daughter. CCI's counsel was therefore asked for patience and to postpone its discovery motion. CCI's counsel refused. Pursuant to Eastern District of California Local Rule 37-251, CCI and Defendants prepared and submitted a joint statement regarding CCI's discovery dispute: (See "Joint Statement Re Discovery Disagreements" filed on or about April 30, 2004)

During the discovery hearing before Magistrate Mueller Defendants' counsel offered, as he did with CCI's counsel, to provide copies of computer hard drives. On May 20, 2004 Magistrate Mueller ordered Hewitt to produce a "compact disc containing mirror images of any hard drives of the computers in defendants' possession that contain documents responsive to plaintiff's request for production of documents."[9] However, because she levied monetary sanctions for the delay in getting documents to CCI, Magistrate Mueller apparently ignored the legitimate reasons proffered by Defendants' counsel that heavily contributed to the delay in producing documents to CCI which were: (1) CCI's initial request to put discovery on hold; (2) Mr. Wohl's unavailability during the month of March and half of April due to trial; (3) the May 4, 2004 birth of Mr. Wohl's daughter, and (4) the life-threatening illness to Mr. Fite's infant son that caused Mr. Fite to take a leave of absence.

On May 28, 2004, Hewitt caused to be hand-served on CCI compact discs containing what he reasonably believed were exact duplicates or "mirrors" of computer hard drives.

---

[9] In a separate pleading Defendants have asked that the Court take Judicial Notice of the Magistrate's May 20, 2004 Order.

WOHL
SAMMIS
&PERKINS LLP
ATTORNEYS AT LAW
1006 4th St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax   (916) 447-6400

1  (Reporter's Transcript of Evidentiary Hearing [hereinafter "RT"], pp. 90-92, attached as Exhibit

2  No. 4 to Declaration of Christopher Wohl, Esq..)  Hewitt did *not* know at the time Magistrate

3  Mueller issued her order (nor did any of the lawyers involved in this case) that there was a

4  distinction between a "duplicate copy/mirror" image and what is called a "forensically captured

5  mirror" image.  (RT pp. 58-59, 61, 90-92, Exhibit 4)

6       On June 2, 2004, Hewitt caused to be hand-served on CCI's counsel more than 20,700

7  responsive documents. (Declaration of Robin K. Perkins, Esq., Exhibit 1)

8       In early June 2004 what has been called Pacific Crest's hard drive four "crashed" and

9  was not operational.  On June 7, 2004 Hewitt started communicating by telephone and through

10 email with customer service technicians at Dell Computers to resolve the operational problems

11 with hard drive number four.  (RT p. 105, Exhibit 4)  In an attempt to fix the problem Hewitt

12 purchased a new "motherboard", a new DVD-ROM drive, added memory, and also installed a

13 new hard drive.  These attempts to fix hard drive four were not successful. (*Id* at p. 106).

14 However, all of the information on hard drive four was transferred to hard drive number two

15 *before* hard drive number four was reformatted by Hewitt. (*Id.* at p. 111)

16      In early July 2004, Hewitt learned for the first time that CCI claimed that "duplicate"

17 copies of computer hard drives did not equate with "mirrors."  Hewitt therefore went to

18 computer store CompUSA where he asked a sales expert for software that could make a

19 "mirror" of a computer hard drive.  (RT p. 93, Exhibit 4)  The CompUSA sales person told

20 Hewitt to purchase Norton's "Ghost" software. (*Id.* p. 94)  CCI's computer expert Menz

21 concedes that there is some confusion regarding Ghost's ability to reproduce a forensic mirror

22 versus an exact copy. (*Id.* p. 61)  Hewitt also purchased an external DVD-ROM to make what

23 he believed were mirrors. (*Id.* p. 96)  After purchasing the Ghost software and the external

24 DVD-ROM Hewitt proceeded to make the mirror images, which were thereafter delivered

25 through counsel to CCI. (*Ibid*)

26      On July 12, 2004, CCI's counsel claimed in a letter that Hewitt's use of "Ghost"

27 software did not reproduce a "forensically captured mirror."  Hewitt, like CCI's counsel, was

28 confused    about    the    difference    between    a    "forensically    captured    mirror"    versus    a

WOHL
SAMMIS
&PERKINS LLP
ATTORNEYS AT LAW
1006 4th St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax   (916) 447-6400

- 12 -

1  "mirror/duplicate copy." (RT pp. 59, 98, Exhibit 4) After receiving a copy of Mr. Daponde's

2  letter Hewitt researched the matter further and for the first time discovered that a "forensically

3  captured mirror" was distinguished from a "duplicate copy," in that the former would be able to

4  extract and reproduce emails that he sent and received and also Internet histories even though

5  this information was irrelevant and, more importantly, had been deleted *before* CCI filed its

6  lawsuit in September 2003. (*Id.* pp. 98-99) Hewitt testified that he "freaked out a little bit" at

7  the prospect of having his personal and private emails and Internet histories uncovered and

8  made public. (*Id.* at 98) Hewitt was afraid that CCI would be able to copy and publish

9  irrelevant and private emails he previously deleted (i.e., emails that were deleted and emptied

10  into the Microsoft Outlook "recycle bin" *before* this lawsuit commenced) evidencing an "on-

11  line" relationship with another woman. (*Id.* at pp. 99-100) Hewitt also wanted to keep private

12  the Internet sites that he had visited over the last several years and, like the personal and private

13  emails, were also discarded into the "recycle bin" before this lawsuit started. (*Id.* at p. 101)

14  　　　To keep this private, personal and irrelevant information out of CCI's hands, to prevent

15  its disclosure to the public and perhaps Hewitt's wife, Hewitt used a software application

16  designed to overwrite previously deleted information from computer hard drives. (RT pp. 99,

17  102, Exhibit 4) Regrettably, the software is called Evidence Eliminator. Hewitt never

18  discussed using any privacy protection software with his counsel. (*Id.* p. 102) No matter what

19  his privacy concerns, Hewitt should not have used any software that deleted any information off

20  of his hard drives. However, Hewitt would not by anyone's definition be considered a

21  computer "expert." (*Id.* p. 91) This is perhaps best evidenced by the fact that although Hewitt

22  tried he failed to remove *all* personal and embarrassing material from the computer hard drive

23  1. (*Id.* pp. 100-101) Although this was not Hewitt's primary computer (hard drive number 2

24  was), Hewitt inadvertently failed to clean the "recycle bin." (*Id.* p. 66; see also ¶ 7 of Caouette

25  Declaration, Exhibit 2) As a result an embarrassing trail of pornographic images, pictures and

26  personal Internet histories remained for Menz to discover. (*Id.* pp. 28, 65-66)

27  　　　CCI learned that Hewitt used Evidence Eliminator and shortly thereafter filed its motion

28  requesting default judgment claiming, without evidence, that Hewitt deleted documents relevant

Wohl
Sammis
&Perkins LLP
ATTORNEYS AT LAW
1006 4ᵗʰ St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax (916) 447-6400

- 13 -

1   to this action.  Defendants' opposition to CCI's motion included a declaration by computer

2   expert Greg Caouette of Kroll Ontrack.  Mr. Caouette confirmed in his declaration that CCI

3   could not identify a single relevant file deleted by Hewitt.  Even CCI's expert Mark Menz

4   cannot dispute this fact.  (RT p. p. 54, 67-70, 76, 77)  Rather, Caouette established that in using

5   Evidence Eliminator Hewitt only deleted *"links"* to some potentially relevant documents but

6   **not** the actual documents themselves. (Exhibit B attached to Declaration of Greg Caouettte,

7   Exhibit 2)  This objectively verifiable evidence also includes the actual mirrored hard drives

8   produced to CCI.  The hard drives contain <u>all</u> documents in Hewitt's possession relevant to

9   CCI's claims.  Significantly, these hard drives also contain the <u>very documents</u> which CCI

10  represents in its Motion were destroyed by Hewitt.  (Exhibits C and D attached to Declaration

11  of Greg Caouettte, Exhibit 2)  Defendants' filed a cross-motion for monetary sanctions against

12  CCI for its counsel's failure to make any effort to determine if the any relevant *files* were

13  actually deleted (as opposed to "links" being deleted).

14        On December 1, 2004 the cross-motion for sanctions was heard by Magistrate Mueller,

15  who took the matter under submission.

16        On December 15, 2004 Magistrate Mueller issued an Order[10] regarding the cross-motion

17  for sanctions.  In the order Magistrate Mueller considered objections Defendants' filed in

18  response to "a large part of the evidentiary matter submitted on plaintiff's motion" (including

19  sustainable objections to CCI's unsupported request for attorney's fees and costs) and ruled that

20  "[m]any of those objections appear to be well taken."  Based on Defendants' objections to

21  CCI's proffered evidence, Magistrate Mueller ordered that (1) an evidentiary hearing take place

22  and (2) that within twenty days CCI's counsel submit "billing records" for time it allegedly

23  spent on the motion for sanctions.

24        On or about January 4, 2005 CCI's counsel submitted a Declaration in Support of

25  Request for Attorneys' Fees Re Motion for Sanctions (Sanctions Declaration) purportedly in

26  compliance with Magistrate Mueller's December 15, 2004 order that CCI submit "billing

27  records."  CCI's Sanctions Declaration, however, did not include "billing records" as ordered

28

---

[10] In a separate pleading Defendants have asked that the Court take Judicial Notice of the Magistrate's December 15, 2004 Order

WOHL
SAMMIS
&PERKINS LLP
ATTORNEYS AT LAW
1006 4th St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax  (916) 447-6400

- 14 -

1    by Magistrate Mueller.    Notably, CCI's counsel Mike Daponde, Esq., conceded in his

2    declaration that his prior declaration included erroneous hourly billing rates for "the attorneys

3    and staff working on this matter"; not surprisingly, CCI's counsel did not *underestimate* the

4    fees sought but rather significantly overreached.[11]

5          On February 22, 2005 an evidentiary hearing was held before Magistrate Mueller.

6    Consistent with his deposition testimony and the declaration he submitted in opposition to

7    CCI's motion for default, Hewitt testified during the hearing that he did not destroy a single

8    document relevant to this litigation.  .  (RT pp. 54, 92, 93, 102, 114, 121)  CCI's computer

9    expert Menz also admitted that he could not determine if Hewitt deleted any files relevant to

10    this case. (RT p. 54, Exhibit 4)  It was also confirmed during the hearing that CCI obtained

11    from Defendants' computer hard drives a treasure trove of evidence that it had used during

12    depositions (including Hewitt's) in this case.  For example, CCI obtained from the hard drives

13    emails between Hewitt and the "clients" that CCI alleges Hewitt stole (Binder Research,

14    Selzer Communications, Socratic Technologies, Anzalone Listz, and Kiley & Company.)

15    CCI also obtained from the hard drives information relative to Pacific Crest's accounts

16    receivables and payables (including invoices and descriptions of jobs), pricing models (that

17    CCI claims was taken from them), the CCI client list, a CCI power point presentation, emails

18    between Hewitt and what CCI alleges are Hewitt co-conspirators Prather and Komatsu, and

19    other documents that CCI has used as evidence thus far.  (RT pp. 88-91, 121)

20          On February 24, 2005 Magistrate Mueller issued another order[12] regarding CCI's

21    request for attorney's fees and costs.  Magistrate Mueller again ordered that CCI provide billing

22    records (even though Defendants' objections' to CCI's request for attorney's fees was *sustained*

23    by Magistrate Mueller on December 15, 2004.)  Counsel for Defendants' was never given the

24    opportunity to challenge CCI's claim that it incurred $145,811.75 in "reasonable" attorney's

25    fees and costs.

26          On April 5, 2005 Magistrate Mueller issued her Order and Findings and

27

28

---

[11] In a separate pleading Defendants have asked that the Court take Judicial Notice of Mr. Daponde's January 4, 2005 Declaration where he admitted providing erroneous information to the Magistrate.

[12] In a separate pleading Defendants have asked that the Court take Judicial Notice of the Magistrate's February 24, 2004 Order

WOHL
SAMMIS
&PERKINS LLP
ATTORNEYS AT LAW
1006 4th St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax  (916) 447-6400

- 15 -

1   Recommendations proposing that: (1) Defendants' Answer is stricken; (2) default be entered

2   against Defendants; and (3) Defendants pay $145,811.75 in attorney's fees and costs claimed to

3   have been incurred by Plaintiff's counsel.

4                              **III.      ARGUMENT**

5        Federal Rules of Civil Procedure, Rule 37 provides that "[i]f a party ... fails to obey an

6   order to provide or permit discovery ... , the court in which the action is pending may make such

7   orders in regard to the failure as are just ... " Fed R. Civ. Proc 37(b)(2)   Violation of a court

8   order regarding discovery is required to trigger the sanctions under Rule 37. (*Unigard Sec. Ins.*

9   *Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 367-68 (9th Cir. 1992))   "The central

10  factor in evaluating a district court's order ... is justice ... " (*Valley Engineers Inc. v. Electric*

11  *Engineering Co.*, 158 F.3d 1051, 1056 (9th Cir. 1998))   The United States Supreme Court has

12  made clear that a Court's discretion to impose sanctions under Rule 37(b)(2) is limited by two

13  standards: (1) any sanction must be "just"; and (2) the sanction must be specifically related to

14  the particular "claim" at issue in the order to provide discovery. *Insurance Corp. of Ireland*,

15  456 U.S. 694, 707 (1982).

16       **A.      Standard of Review**

17       Pursuant to Federal Rules of Civil Procedure Rule 72 (b) the "district judge to whom the

18  case is assigned shall make a de novo determination upon the record, or after additional

19  evidence, of any portion of the magistrate judge's disposition to which specific written

20  objection has been made in accordance with this rule.   The district judge may accept, reject, or

21  modify the recommended decision, receive further evidence, or recommit the matter to the

22  magistrate judge with instructions." In conducting de novo review of magistrate judge's findings

23  and recommendations, although it is not necessary to hold de novo hearing, the district court

24  must arrive at its own independent conclusion about those portions of magistrate judge's

25  findings or recommendations to which objections are made. (Goldstein v. Hawaii Medical

26  Service Ass'n, D.Hawai'i, 297 F.Supp.2d 1259 (2003).)

27       **B.      Hewitt Did Not Intentionally Violate Magistrate Mueller's May 20, 2004**

28                **Discovery Order and the District Court is Respectfully asked to Reject the**

WOHL
SAMMIS
&PERKINS LLP
ATTORNEYS AT LAW
1006 4ᵗʰ St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax   (916) 447-6400

- 16 -

## Magistrate's Recommended Decision

Magistrate Mueller's May 20, 2004 Order requires Hewitt to produce "mirror" images of certain computer hard drives. Hewitt read Magistrate Mueller's and reasonably believed he was required to provide CCI with a "duplicate copy" of computer hard drives. (RT pp. 90-92, Exhibit 4) He did *not* know at the time Magistrate Mueller issued her order (nor did any of the lawyers involved in this case) that there was a distinction between a "duplicate copy/mirror" image and what is called a "forensically captured mirror" image. (*Id.* at pp. 59, 98)

Although Hewitt originally misunderstood the difference between a computer hard drive "mirror" versus a duplicate "copy", in compliance with the May 20th Order mirrors were ultimately produced. The only files that CCI did not obtain are some of the files identified in EE Log, including Hewitt's recent Internet histories. (Declaration of Greg Caouette [Exhibit 2]; Declaration of Matt Hewitt [Exhibit 3]) These files and recent Internet histories are completely irrelevant to the claims and contentions made by CCI. While Hewitt may have been misguided in his attempt to protect and preserve his privacy rights, he did not willfully or knowingly violate an order of this Court. (RT pp. 54, 92, 93, 102, 114, 121, attached as Exhibit 4 to Declaration of Christopher Wohl, Esq) Hewitt read Magistrate Mueller's and reasonably believed he was required to provide CCI with a "duplicate copy" of computer hard drives. (RT pp. 90-92, Exhibit 4 *supra*; See also Declaration of Matt Hewitt, Exhibit 3) Hewitt's actions were not malicious or deceitful as CCI would like the Court to believe. Hewitt simply wanted to prevent embarrassing and private information (including an on-line "romance" that has long since ended) from being disclosed to CCI and others. (Declaration of Matt Hewitt, Exhibit 3; RT at pp. 94-96, 99-100)

What really is at issue is the undisputable fact that CCI has not and cannot prove that one single document related to this litigation was destroyed. (Declaration of Greg Caouette, Exhibit 2; Declaration of Matt Hewitt, Exhibit 3; RT pp. 54, 92, 93, 102, 114, 121 Exhibit 4 to Declaration of Christopher Wohl, Esq.) Indeed, CCI already has in their possession the very documents that CCI represents to this Court as being "gone forever." (*Ibid*) Contrary to the representation of CCI, **Hewitt has not destroyed or withheld one single document on**

WOHL
SAMMIS
&PERKINS LLP
ATTORNEYS AT LAW
1006 4th St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax    (916) 447-6400

- 17 -

1 **computer hard drive numbers one, two or three that in any way relate to any of CCI'S**

2 **claims**—this is not disputed.  (RT pp. 54, 92, 93, 102, 114, 121, Exhibit 4 to Declaration of

3 Christopher Wohl, Esq.)

4     Based upon the Declaration of its purported expert, Mark Menz, CCI claims Hewitt

5 destroyed critical documents.  Throughout its Motion CCI refers to files identified as "DBR

6 Bids," "KIL1130" which CCI claims were deleted by Hewitt from his laptop computer (i.e.,

7 "Drive 2"; See CCI'S Motion for Sanctions, p. 11:9-13.)  **This claim by CCI is absolutely**

8 **false.** (See Exhibit A attached to Declaration of Hewitt, [Exhibit 3]) "DBR Bids" is actually a

9 folder on Drive 2 where the file "PCR pricing for DBR2004.xls" may be located.  The folder

10 and file on still on Drive 2. (Exhibit C, attached to Declaration of Greg Caouette [Exhibit 2];

11 Exhibit A, attached to Declaration of Matt Hewitt, [Exhibit 3])

12     "KIL1130" is a folder on Drive 3 where the files "KC24177 Dispo 07-11-04.doc";

13 "KC24177 Marginal 07-11-04.doc"; "KC24177 Dispo 07-12-04.doc"; and "KC24177 Marginal

14 07-12-04.doc" may be located. (Exhibit D to Declaration of Greg Caouette [Exhibit 2]; Exhibit

15 A attached to Hewitt Declaration, [Exhibit 3])  The "monthly schedule" folder on Drive 3 is

16 where the file "07-04.xls" may be located.  The "jobs" folder, "PP14" folder, "PP15" folder and

17 "SOC" folder are also located on Drive 3. (Exhibit C attached to Declaration of Greg Caouette

18 [Exhibit 2]; Declaration of Matt Hewitt, [Exhibit 3])  These folders and files were never

19 destroyed. (Exhibits B and C attached to Declaration of Greg Caouette [Exhibit 2]; Declaration

20 of Matt Hewitt [Exhibit 2]; RT p. 102, Exhibit 4 attached to Declaration of Christopher Wohl,

21 Esq.)

22     The specific folders and files which CCI claims were deleted are still contained on

23 drive numbers two and three, Hewitt's laptop and network server.  (Declaration of Greg

24 Caouette [Exhibit 2]; Declaration of Matt Hewitt [Exhibit 3].)  These documents have never

25 been destroyed and CCI knows, or should know, that fact.  (*Ibid.*)  Pursuant to this Court's

26 May 20th Order those folders and files were in fact produced to CCI via Drive 3. (*Ibid.*)  As

27 the EE Log shows, the only item destroyed by Hewitt's privacy software was the *"link"* to

28 these documents from the time in which Hewitt accessed the network server from his laptop.

WOHL SAMMIS &PERKINS LLP ATTORNEYS AT LAW 1006 4th St. Fourth Floor Sacramento, CA 95814 Phone (916) 446-2000 Fax (916) 447-6400

- 18 -

1  (*Ibid.*)  In fact, CCI'S entire argument that there is no evidence that Hewitt only deleted

2  personal information is directly contradicted by this very EE Log which shows all files which

3  were eliminated by Hewitt's privacy software.  This EE log also proves, consistent with

4  Hewitt's testimony, that <u>only</u> personal and embarrassing files were eliminated from the

5  computer hard drives and that no relevant files or folders were destroyed; Hewitt did not

6  destroy any documents that in any way relate to any of CCI'S claims. (RT pp. 54, 92, 93, 98-

7  102, 114)  Exhibit 4 attached to Declaration of Christopher Wohl, Esq.)

8          There was also nothing sinister or malicious concerning the production of the fourth

9  hard drive as CCI suggests.  (RT p. 104-106, 121, Exhibit 4 to Declaration of Christopher

10  Wohl, Esq.)  A "new operating system" was not reinstalled to defeat discovery efforts or to

11  violate Magistrate Mueller's Order.  In early June 2004 what has been called hard drive

12  number four "crashed" and was not operational.  On June 7, 2004 Hewitt started

13  communicating by telephone and through email with customer service technicians at Dell

14  Computers to try and resolve the operational problems with hard drive number four.  (*Id.* p.

15  105)  To try to fix the problem Hewitt purchased a new "motherboard", a new DVD-ROM

16  drive, added memory, and also installed a new hard drive.  These attempts to fix hard drive

17  four were not successful. (*Id* at p. 106)  However, all of the information on hard drive four

18  was transferred to hard drive number two *before* hard drive number four was reformatted by

19  Hewitt.  (*Id.* at p. 111; See also, Exhibit B, Deposition of Matt Hewitt, p. 32:8-22; 34:22-24;

20  386:5-387:13, attached to Declaration of Robin K. Perkins, Esq., [Exhibit 1])  Thus, all

21  information from this computer was produced to CCI on hard drive number two.

22          **C.    <u>Entry of Default is an Extreme Remedy That is Rarely Appropriate</u>**

23          Dismissal or entry of a default judgment under Rule 37 is appropriate "only in

24  exceptional circumstances." (<u>Wyle v. R.J. Reynolds</u>, 709 F.2d 585, 589 (9th Cir. 1983).  Such a

25  sanction is justified "only where the failure to comply is due to willfulness, bad faith, or fault of

26  the party, or if the party acts in 'flagrant disregard' of the court's orders."  (<u>Exxon Valdez</u>, 102

27  F.3d 429, 432 (9th Cir. 1996), see also <u>G-K Properties v. Redevelopment Agency</u>, 577 F.2d

28  645, 647 (9th Cir. 1978).  Before a punitive sanction such as a dismissal or default judgment is

WOHL
SAMMIS
&PERKINS LLP
ATTORNEYS AT LAW
1006 4th St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax   (916) 447-6400

- 19 -

1 | entered, there must be clear and convincing evidence of misconduct. (Pennar Software Corp. v.

2 | Fortune *500 Sys.*, 2001 U.S. Dist. LEXIS 18432, 51 Fed.R.Serv.3d (Callaghan) 279; see also

3 | Shepherd v. ABC, 62 F.3d 1469, 1478 (D.C. Cir 1995). Dismissal and default judgment are

4 | authorized only in "extreme circumstances." (Fjelstad v. American Honda Motor Co., Inc., 762

5 | F.2d 1334, 1338 (9th Cir.1985).)

6 | There are five factors which a court must consider before dismissing a case or declaring

7 | a default: (1) the public's interest in expeditious resolution of litigation; (2) the court's need to

8 | manage its docket; (3) the risk of prejudice to the other party; (4) the public policy favoring the

9 | disposition of cases on their merits; and (5) the availability of less drastic sanctions.  In most

10 | cases, the first two of these factors favor the imposition of sanctions, while the fourth cuts

11 | against a default or dismissal sanction.  Thus, the key factors are prejudice and availability of

12 | lesser sanctions.  (Wanderer v. Johnston 910 F2d 652, 655 (9th Cir 1990))  The element of

13 | prejudice is essential. "Sanctions which interfere with the litigants' claim or defenses violate

14 | due process when they are imposed `merely for punishment of an infraction that did not

15 | threaten to interfere with the rightful decision of the case.'" (*Ibid.*)

16 | Evaluating the key factors set forth above, it is clear that default is not justified in this

17 | case.

18 | **(1)  The Public's Interest in Expeditiously Resolving This Case has Not Been**

19 | **Effected**

20 | Hewitt's conduct, while improper, has not "impeded resolution of the case." (Malone v.

21 | United States Postal Service, *supra,* 833 F. 2d 128, 131.)  Aside from continuing the date for

22 | the disclosure of expert witnesses, this discovery matter has not impacted the public's interest

23 | resolving this case expeditiously.

24 | **(2)  The Court's Need to Manage its Docket**

25 | Trial in this matter is scheduled to begin on August 9, 2005.  Hewitt's mental gaffe has

26 | *not* "prevented the district court from adhering to its trial schedule." (Malone v. United States

27 | Postal Service, *supra,* 833 F. 2d 128, 131.)  An extensive amount of discovery was completed

28 | within the discovery deadline set by the Court.  Depositions were taken in Spokane,

WOHL
SAMMIS
&PERKINS LLP
ATTORNEYS AT LAW
1006 4th St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax   (916) 447-6400

- 20 -

Washington, Washington D.C., Boston, Massachusetts, San Francisco, Iowa (via telephone) and Sacramento. Only expert witnesses need to be disclosed and deposed. Hewitt will be ready to proceed to trial as scheduled on August 9, 2005. (Declaration of Christopher Wohl, Esq.)

### (3) CCI Has Not Been Prejudiced

"What is most important for case-dispositive sanctions, regarding risk of prejudice and of less drastic sanctions, is whether the discovery violations threaten to interfere with the rightful decision of the case. While contumaciousness toward the court needs a remedy, **something other than case-dispositive sanctions will often suffice. Dismissal is appropriate where a 'pattern of deception** and discovery abuse made it impossible' for the district court to conduct a trial 'with any reasonable assurance that the truth would be available.'" (Valley Engineers Inc. v. Electric Engineering Co., 158 F.3d 1051, 1057 (9th Cir. 1998), quoting Adriana Int'l Corp. v. Thoren, 913 F.2d 1406, 1412 (9th Cir. 1990) emphasis added.)

### (a) CCI Has Not Been Prejudiced Because it has Already Been Determined that None of the "Clients" That CCI Claims Hewitt Unlawfully Solicited Support CCI's Claim

As discussed in the Statement of Facts, *supra,* the heart of CCI's case is based on the claim that Hewitt used CCI's proprietary client list and other "trade secrets" to unlawfully solicit and obtain business from five identifiable CCI clients, *infra*. So, even if CCI could establish that Hewitt's computer hard drives had these CCI "trade secrets" that were subsequently deleted, CCI only prevails in this case if it can prove Hewitt profited through the unlawful solicitation of CCI clients. CCI cannot point to a single client that it lost to Defendants because of unlawful solicitation by Hewitt. The clients that CCI claims Hewitt unlawfully solicited and profited from (Kiley & Company, Socratic Technologies, Anzalone Liszt Research, Selzer & Company, and Binder Research) do not corroborate any of CCI's claims.

### 1.) *Kiley & Company Fired CCI*

Kiley & Company ("Kiley") is a former CCI client that by 1999 (i.e., before Hewitt left

WOHL
SAMMIS
&PERKINS LLP
ATTORNEYS AT LAW
1006 4th St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax   (916) 447-6400

- 21 -

1 | to form Pacific Crest) had given most of its work to a CCI competitor called The Parker Group.
2 | (Exhibit H, Griffin depo, 11:14-17, 19:17-24, 20, 21, and Exhibit D, Schleifer depo, 203:1-12,
3 | attached to Declaration of Robin Perkins, Esq., [Exhibit 1])   After giving CCI several
4 | opportunities to keep their business Kiley ultimately fired CCI after discovering that CCI
5 | falsified data on surveys.  (Exhibit H, Griffin depo, 22:23-24, 23-27, 39:16-20; Exhibit D,
6 | Schleifer depo, 202:21-22, 203:1-12, attached to Declaration of Robin Perkins, Esq., [Exhibit
7 | 1])   Schleifer concedes that CCI falsified data on Kiley jobs.  (Exhibit D, Schleifer depo,
8 | 206:11-21, *supra*)   Schleifer also admits that he has had to terminate or discipline CCI
9 | employees for falsifying data on more than an alarming "500" occasions.  (Exhibit D, Schleifer
10 | depo, 206:22, 207:1-11, *supra*)

11 |     After firing CCI, Kiley needed a call center to back up another call center known as the
12 | The Parker Group (which is a competitor of Pacific Crest and CCI).  Griffin called Hewitt.
13 | (Exhibit H, Griffin depo, at 30:10-23, attached to Declaration of Robin Perkins, Esq., [Exhibit
14 | 1])  Griffin decided to give Pacific Crest a small job to see how they did. (*Id.* at 35-36.)  Griffin
15 | was impressed with Pacific Crest's work and decided to use them as Kiley's primary vendor.
16 | (*Id.* at 36:24, 37:1-20.)  It is undisputed that Kiley's decision to fire CCI had nothing to do with
17 | Hewitt and that misappropriation against Defendants ***cannot*** be established.  (*Id.* at 39:21-24,
18 | 40:1-2.)

19 | **2.) *Socratic Technologies Fired CCI***

20 |     Although Socratic Technologies' ("Socratic") Vice President Patty McDowell heard
21 | "negative things" about CCI's performance, she decided to give CCI business *because of*
22 | Hewitt.  (Exhibit J, McDowell depo, 14:12-24; 34:1-11, attached to Declaration of Robin
23 | Perkins, Esq. [Exhibit 1])  After learning that Hewitt had left CCI and started his own business,
24 | and because she believed Hewitt did "quality work", McDowell contacted Hewitt and asked
25 | him to "bid" on an upcoming Socratic job.  (*Id.* at 32:1-11, 33:5-22.)  **McDowell testified that**
26 | **not a single job that went to Pacific Crest would have gone to CCI.**  (*Id.* 25:9-25, 26, 27:1-
27 | 21, 44:18-25, ["no business that Matt Hewitt did, has done for us, would have gone to CCI" *Id.*
28 | at 67:11-16])  Socratic's President described CCI's lawsuit against Hewitt as "nonsense" and

WOHL
SAMMIS
&PERKINS LLP
ATTORNEYS AT LAW
1006 4th St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax   (916) 447-6400

1  because of CCI's actions Socratic will not give any more business to CCI. (*Id.* at 42:3-25,

2  63:15-25, 64, 65:21-25, 66:1-3.)

### 3.) *Selzer & Company Fired CCI*

4      Anne Selzer, President of Selzer & Company ("Selzer"), testified during her deposition

5  that she lost confidence in CCI when in July of 2003 (about *a year before* Pacific Crest started)

6  Selzer's primary contact person at CCI, Takako Komatsu, resigned. (Exhibit I, Selzer depo, p.

7  17-18, attached to Declaration of Robin Perkins, Esq. [Exhibit 1])  Selzer testified that she was

8  disappointed with the service she received from CCI after Komatsu left CCI. (*Id.* at 21, 22.)

9  Selzer complained on several occasions to CCI about their poor performance but it did not

10  improve. (*Id.* at 36, 37, 40, 42).  Because of the problems she was having, Selzer considered

11  the recommendation by her friend Takako Komatsu to use Pacific Crest.  In November of 2003

12  Selzer decided to give a few small jobs to Hewitt to see how Pacific Crest performed. (*Id.* at

13  52-53)  Selzer believed that Hewitt performed "very well" so she gave Pacific Crest additional

14  work. (*Ibid*)  Selzer also continued to give a small amount of work to CCI in 2003 only because

15  CCI was familiar with the particular job. (*Id.* at 53)  However, Selzer was again dissatisfied

16  with CCI's performance on this particular job (she felt "slighted").  She testified that she lost all

17  confidence in CCI President Schleifer, had a "miserable experience" with CCI's overall

18  performance, and for those reasons **Selzer fired CCI**. (*Id.* 53, 55, 56.)

### 4.) *CCI Consented to Hewitt's Solicitation of Anzalone Liszt Research*

20      CCI President Schleifer encouraged Hewitt to seek business from Anzalone Liszt

21  Research because they were a "very difficult client" for CCI.  (Exhibit A, Komatsu depo, p.

22  28:23-25, 29, 30, 31:1-5, attached to Declaration of Robin Perkins, Esq., [Exhibit 1])  Pacific

23  Crest has done about nine jobs for Anzalone Liszt—all with CCI's consent (*Ibid.*)  Thus, even if

24  Hewitt possessed any alleged trade secrets held by CCI, disclosure to Anzalone Listz Research

25  would have been made with the express or implied consent of CCI.

### 5.) *CCI Consented to Hewitt's Solicitation of Binder Research*

28      Like Anzalone Liszt Research, Binder Research was another company that CCI

WOHL
SAMMIS
&PERKINS LLP
ATTORNEYS AT LAW
1006 4th St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax    (916) 447-6400

- 23 -

1  encouraged Hewitt to contact for business.  But CCI went one step further; CCI actually

2  allowed CCI executives Prather and Lawson to program several Pacific Crest jobs for Binder.

3  (Exhibit B, Hewitt depo, 273:18-25, 279:3-24; Exhibit E, Lawson depo, 34:4-25, 35:1-13,

4  36:15-25, 37, 38, 39:1, 40:13-23; Exhibit A, Komatsu depo, 34:9-21-25, 35, 36:1-20, 119:9-12;

5  Exhibit G, Prather depo, 19:10-25, 20:1-17, 21:20-25, 22:1-10, attached to Declaration of Robin

6  Perkins, Esq., [Exhibit 1])  Schleifer even admits discussing one of these Binder Research jobs

7  with Hewitt in August 2003 but concedes never raising any objection or concern to Hewitt at

8  that time. (Exhibit D, Schleifer depo, 244:6-22, 245:1-8, attached to Declaration of Robin

9  Perkins, Esq., [Exhibit 1])

10      Binder thought Hewitt did "excellent" work and, because Binder uses several call

11  centers (i.e., not just Pacific Crest or CCI) in addition to CCI, Binder decided to give Hewitt a

12  chance to do additional work.   (Exhibit K, Binder depo, 11:14-23, 12:10-22, attached to

13  Declaration of Robin Perkins, Esq., [Exhibit 1])  Binder also gave work to Pacific Crest because

14  he "had a need for an additional vendor" and Pacific Crest's pricing was sometimes "lower than

15  everyone else's." (*Id.* at 27:8-18)  Binder's primary vendor is not CCI or Pacific Crest but

16  rather Sacramento-based EMH. (*Id.* at 13:3-6)  One of the reasons CCI wanted to use Pacific

17  Crest for Binder jobs was to compete against Sacramento-based EMH; CCI knew that Binder

18  preferred working with a local vendor and Pacific Crest's Fairfield location was actually closer

19  than EMH. (*Id.* at 16)  Even if CCI could establish that Hewitt destroyed evidence of their

20  alleged trade secrets, use of those trade secrets with Binder Research was with the express or

21  implied consent of CCI.  Accordingly, any claim for misappropriation must fail.

22      **(b)      There is No Prejudice to CCI Because Even If Hewitt Possessed**

23      **Evidence that CCI Assumes is in Existence CCI Still Cannot Prevail**

24      **in this Case**

25      CCI filed this action on September 19, 2003 alleging causes of action against

26  Defendants for (1) misappropriation of trade secrets, (2) tortious interference with prospective

27  economic advantage, (3) unfair competition, (4) conspiracy, (5) illegal interception of

28  communications, (6) breach of confidentiality agreement, (7) breach of employment agreement,

WOHL
SAMMIS
&PERKINS LLP
ATTORNEYS AT LAW
1006 4th St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax    (916) 447-6400

- 24 -

1  (8) fraud, (9) breach of fiduciary duty, and (10) breach of confidence.  CCI concedes, and

2  Magistrate Mueller agrees, that CCI's claims for breach of employment agreement (seventh

3  cause of action) and fraud (eighth cause of action) were not affected by Hewitt's alleged

4  spoliation and therefore these two claims remain intact.

5      As discussed below, *even if* the documents that CCI hypothesizes existed on

6  Defendants' computer hard drives CCI still cannot prevail on any of the ten causes of action set

7  forth in its complaint.

8      **1.) *Default is Unwarranted as to CCI's Claim for Misappropriation of Trade***

9      ***Secrets.***

10     To state a cause of action for misappropriation of trade secrets under the Uniform Trade

11 Secrets Act ("UTSA"), plaintiff must plead two primary elements : (1) the existence of a trade

12 secret and (2) misappropriation of the trade secret. (Cal. Civil Code § 3426.1(b).)  The UTSA

13 defines the term "trade secret" as:   information, including a formula, pattern, compilation,

14 program, device, method, technique, or process, that: (1) derives independent economic value,

15 actual or potential, from not being generally known to the public or to other persons who can

16 obtain economic value from its disclosure or use; and (2) is the subject of efforts that are

17 reasonable under the circumstances to maintain its secrecy. (Cal. Civil Code § 3426.1(b).)

18 Under section 3426.1(b) of the UTSA, "misappropriation" means the:

19     (1) acquisition of a trade secret of another by a person who knows or has reason to
20     know that the trade secret was acquired by improper means; or

21     (2) disclosure or use of a trade secret of another without express or implied consent by
22     a person who:

23     (A) used improper means to acquire knowledge of the trade secret; or

24     (B) at the time of disclosure or use, knew or had reason to know that his or her
25     knowledge of the trade secret was:

26     (i) derived from or through a person who had utilized improper means to acquire it;

27     (ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit
      its use; or

28

WOHL
SAMMIS
&PERKINS LLP
ATTORNEYS AT LAW
1006 4ᵗʰ St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax   (916) 447-6400

- 25 -

(iii) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(C) before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

In determining what constitutes "use" and "disclosure" of trade secrets in the context of misappropriation, courts have held that mere possession of trade secrets is not sufficient to satisfy this element of the cause of action. (*See* Gibson-Homans Co. v. Wall-Tite, Inc 1992 WL 512411(C.D. Cal.) [holding that mere possession of a notebook in which defendant recorded wall adhesive formulas during his employment with plaintiff company without actual use of the formulas to the commercial detriment of plaintiff did not constitute misappropriation of trade secret].)

It is important to note that default judgment has been recommended by Magistrate Mueller against Defendants **without any determination that CCI possessed trade secrets or that Hewitt misappropriated those trade secrets**.  Indeed, the evidence presented clearly established that Hewitt did not use or misappropriate any alleged trade secret held by CCI.

### 2.) *Default Judgment Should Not Be Entered Against Hewitt on CCI's Claim for Tortious Interference with Prospective Economic Advantage*

CCI claims that Defendants improperly used confidential business information such as client lists, pricing structures, etc. to "raid" CCI clients, prospective clients, employees and to unfairly compete with CCI.  CCI also alleges that Defendants continue to misappropriate trade secrets by "hacking" into CCI computer.

The California Supreme Court laid out the elements for the claim of intentional interference with prospective economic advantage in Della Penna v. Toyota Motor Sales, USA, Inc., 11 Cal.4th 376, 45 Cal.Rptr.2d 436, 902 P.2d 740 (1995).  Those elements are as follows: (1) an economic relationship between the plaintiff and third party containing the probability of future economic benefit to the plaintiff, (2) knowledge by the defendant of the existence of the relationship, (3) intentional acts on the part of the defendant designed to disrupt the relationship, (4) actual disruption of the relationship, and (5) damages to the plaintiff proximately caused by the acts of the defendant. (*Id.* at 389, 45 Cal.Rptr.2d 436, 902 P.2d 740.)  In addition, "a

WOHL
SAMMIS
&PERKINS LLP
ATTORNEYS AT LAW
1006 4th St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax   (916) 447-6400

- 26 -

plaintiff seeking to recover for an alleged interference with prospective contractual or economic relations must plead and prove as part of its case-in-chief that the defendant not only knowingly interfered with the plaintiff's expectancy, but engaged in conduct that was wrongful by some legal measure other than the fact of interference itself." (*Id.* at 393, 45 Cal.Rptr.2d 436, 902 P.2d 740; see also National Med. Transp. Network v. Deloitte & Touche, 62 Cal.App.4th 412, 439-40, 72 (1998) [noting that requirement of independent wrongfulness applies to both intentional and negligent interference claims].)

No specific guidance has been provided with regard to the meaning of "wrongful conduct." However, in Bed, Bath & Beyand v. La Jolla Village Square Venture Partners (1997) 52 Cal.App.4th 867, the California Court of Appeal acknowledged that courts have generally defined that phrase as: (1) conduct that is independently tortious or a restraint of trade; (2) conduct violating a statute, regulation, a recognized rule of common law, or an established standard of a trade or profession, or (3) conduct that is illegal, unfair, or immoral according to common understandings of society." (See also Gemini Aluminum Corp. v. California Custom Shapes, Inc. (2002) 95 Cal.App.4th 1249, 1258-1259. [Actions of defendant which are out of the realm of legitimate business transactions or constitute a violation of a statute or a tort such as fraud or unfair competition characterized as "wrongful conduct."].)

"The focus for determining the wrongfulness of the defendant's intentional acts 'should be on the defendant's objective conduct, and evidence of motive or other subjective states of mind is relevant only to illuminating the nature of the conduct.' Thus, lawful conduct that is 'motivated by a black desire to hurt the plaintiff's business' does not necessarily constitute wrongful conduct." (Sebastian Internat'l v. Russolillo, 128 F.Supp.2d 630, 637 (C.D.Cal. 2001) [quoting Arntz Contracting Co. v. St. Paul Fire & Marine Ins. (1996 47 Cal.App.4th 464,477.])

CCI has not and cannot prove the essential elements of the claim for intentional interference with prospective economic advantage. CCI has failed to establish any wrongful conduct on the part of Hewitt designed to disrupt any prospective economic relationship. CCI cannot prove actual disruption of any relationship *and* CCI cannot prove damages. (Exhibit B, Hewitt depo, 273:18-25, 279:3-24; Exhibit E, Lawson depo, 34:4-25, 35:1-13, 36:15-25, 37, 38,

WOHL
SAMMIS
&PERKINS LLP
ATTORNEYS AT LAW
1006 4th St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax   (916) 447-6400

- 27 -

1  39:1, 40:13-23; Exhibit A, Komatsu depo, 34:9-21-25, 35, 36:1-20, 119:9-12; Exhibit G,

2  Prather depo, 19:10-25, 20:1-17, 21:20-25, 22:1-10, attached to Declaration of Robin Perkins,

3  Esq., [Exhibit 1])

4      Kiley & Co. fired CCI after learning that that CCI falsified data.  (Griffin depo, 22:23-

5  24, 23-27, 39:16-20 Exhibit H *supra,* Schleifer depo, 202:21-22, 203:1-12, Exhibit D, *supra*)

6      Selzer fired CCI.  (Selzer depo, p. 17-18, Exhibit I, attached to Declaration of Robin

7  Perkins, Esq. [Exhibit 1]).  Ann Selzer testified during her deposition that she lost confidence in

8  CCI when in July of 2003 (about *a year before* Pacific Crest started) Selzer's primary contact

9  person at CCI, Takako Komatsu, resigned. (*Ibid.*)  Selzer testified that she was disappointed

10 with the service she received from CCI after Komatsu left CCI.  (*Id.* at 21, 22.)  Selzer

11 complained on several occasions to CCI about their poor performance but it did not improve.

12 (*Id.* at 36, 37, 40, 42).

13     Socratic did not do any business with Hewitt that "would have gone to CCI."

14 (McDowell depo, 14:12-24; 34:1-11, Exhibit J, attached to Declaration of Robin Perkins, Esq.

15 [Exhibit 1]) **McDowell testified that not a single job that went to Pacific Crest would have**

16 **gone to CCI.** (*Id.* 25:9-25, 26, 27:1-21, 44:18-25, ["no business that Matt Hewitt did, has done

17 for us, would have gone to CCI" *Id.* at 67:11-16])  Socratic's President described CCI's lawsuit

18 against Hewitt as "nonsense" and because of CCI's actions Socratic will not give any more

19 business to CCI. (*Id.* at 42:3-25, 63:15-25, 64, 65:21-25, 66:1-3.)

20     CCI actively encouraged Hewitt to contact Anzalone Liszt Research because they were

21 a "very difficult client" for CCI.  (Exhibit A, Komatsu depo, p. 28:23-25, 29, 30, 31:1-5,

22 attached to Declaration of Robin Perkins, Esq., [Exhibit 1])

23     CCI told Hewitt to contact and perform work for Binder Research. But CCI went one

24 step further; CCI actually allowed CCI executives Prather and Lawson to program several

25 Pacific Crest jobs for Binder. (Exhibit B, Hewitt depo, 273:18-25, 279:3-24; Exhibit E, Lawson

26 depo, 34:4-25, 35:1-13, 36:15-25, 37, 38, 39:1, 40:13-23; Exhibit A Komatsu depo, 34:9-21-25,

27 35, 36:1-20, 119:9-12; Exhibit G Prather depo, 19:10-25, 20:1-17, 21:20-25, 22:1-10, attached

28 to Declaration of Robin Perkins, Esq., [Exhibit 1])

WOHL
SAMMIS
&PERKINS LLP
ATTORNEYS AT LAW
1006 4th St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax    (916) 447-6400

- 28 -

1    Even assuming that relevant and discoverable information was deleted from Hewitt's

2 computer, the testimony and evidence set forth above establishes that CCI's claim for

3 interference with prospective economic advantage lacks merit. Accordingly, default judgment

4 as to this claim is unwarranted.

5                  **3.) *Default Judgment Should Not Be Entered Against Hewitt on CCI's Claim***

6                  ***for Unfair Competition.***

7    California Business and Profession Code section 17200 defines "unfair competition" to

8 "include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue

9 or misleading advertising ...." The California Supreme Court has repeatedly given the broadest

10 possible definition to the term 'unfair competition.'" (Consumers Union of United States, Inc. v.

11 Fisher Development, Inc. (1989) 208 Cal.App.3d 1433, 1438.) "An unlawful business activity

12 includes anything that can properly be called a business practice and that at the same time is

13 forbidden by law." (People v. McKale (1979) 25 Cal.3d 626, 632.)

14    While the scope of conduct covered by the Unfair Competition Law ("UCL") is broad,

15 its remedies are strictly limited. (Cel-Tech Communications, Inc. v. Los Angeles Cellular

16 Telephone Co. (1999) 20 Cal 4th 163, 179.) A UCL action is equitable in nature and damages

17 cannot be recovered. (Korea Supply Co. v. Lockheed Martin Corp. (2003) 29 Cal.4[th] 1134,

18 1150.) "...[N]onrestitutionary disgorgement of profits is not an available remedy in an

19 individual action under the UCL." (*Ibid.* at p. 1152.) Nor can attorney's fees be recovered

20 except to the extent that attorney's fees are recoverable under the private attorney general

21 provisions under Code of Civil Procedure Section 1021.5. "Prevailing plaintiffs are generally

22 limited to injunctive relief and restitution." (Cal-Tech Communication, supra, 20 Cal.4th at p.

23 179.)

24    In this case, the evidence presented by Hewitt conclusively proves that he was in fair

25 competition for business with CCI. Hewitt obtained Kiley's business after Kiley fired CCI

26 when it was discovered that CCI falsified critical survey data. Socratic simply did not give any

27 business to Hewitt that would have gone to CCI. Seltzer fired CCI due to unsatisfactory

28 performance. CCI actually encouraged and assisted Hewitt in obtaining the business of

WOHL
SAMMIS
&PERKINS LLP
ATTORNEYS AT LAW
1006 4th St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax   (916) 447-6400

- 29 -

1 Anzalone Liszt Research and Binder Research. This evidence directly refutes CCI claim of

2 unfair competition. More importantly, this evidence establishes that here is no legal or

3 equitable basis to enjoin Hewitt from continuing to operate Pacific Crest and work for Kiley,

4 Socratic, Seltzer, Anzalone Liszt Research or Binder Research.

5 **4.) *Default Judgment Should Not Be Entered Against Hewitt on CCI's Claim***

6 ***for Conspiracy.***

7 "Conspiracy is not a cause of action, but a legal doctrine that imposes liability on

8 persons who, although not actually committing a tort themselves, share with the immediate

9 tortfeasors a common plan or design in its perpetration." (Applied Equipment Corp. v. Litton

10 Saudi Arabia Ltd. (1994) 7 Cal.4th 503, 510-511.) Liability for civil conspiracy generally

11 requires proof of three elements: (1) formation of the conspiracy (an agreement to commit

12 wrongful acts); (2) operation of the conspiracy (commission of the wrongful acts); and (3)

13 damage resulting from operation of the conspiracy. In addition to those three elements it has

14 been said that participants in a conspiracy also must know that their conduct is wrongful. A

15 party harmed by a conspiracy "is entitled to damages from those defendants who concurred in

16 the tortious scheme with knowledge of its unlawful purpose." (Wyatt v. Union Mortgage Co.

17 (1979) 24 Cal.3d 773, 784.)

18 Notwithstanding these requirements, CCI has failed to present any evidence that Hewitt

19 and Pacific Crest engaged in a conspiracy. In fact, there is no evidence to prove that CCI and

20 Hewitt formed or operated any conspiracy. Instead, CCI relies upon pure conjecture and

21 speculation that there was some nefarious scheme to deprive CCI of business and steal away its

22 business. As set forth above, businesses have left CCI and given work to Pacific Crest anad

23 others because CCI falsified data and performed poorly. CCI lost business in fair competition

24 with Hewitt. For these reasons and the reasons set forth herein, default judgment with regard to

25 the conspiracy claim is unwarranted.

26

27

28

WOHL
SAMMIS
&PERKINS LLP
ATTORNEYS AT LAW
1006 4th St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax   (916) 447-6400

- 30 -

1           **5.) *Default Judgment Should Not Be Entered Against Hewitt on CCI's Claim***

2               ***for Illegal Interception of Communications.***

3        By their Fifth Cause of Action, CCI asserts a claim for "Illegal Interception of

4 Communications."   CCI claims that Hewitt accessed CCI's network and "intentionally

5 intercepted and/or improperly accessed electronic communications" in violation of 18 U.S.C.

6 Section 1030 et. seq., Section 2510 et. seq. and Section 2701.  The claim stems from Hewitt's

7 access to what CCI claims is its "secure computer network."  (CCI Complaint, ¶¶ 71-72.)

8        In a similar case, the Ninth Circuit was asked to determine whether Hawaiian Airlines

9 violated either the Wiretap Act, 18 U.S.C. §§ 2510-2522, or the Stored Communications Act,

10 18 U.S.C. §§ 2701-2711, when a manager of Hawaiian accessed a secure website maintained by

11 an employee where he posted bulletins critical of his employer and the employer's officers.

12 (Konop v. Hawaiian Airlines, Inc. 302 F.3d 1068 (9th Cir. 2002).)   Like CCI, Konop

13 maintained control of access to his website by requiring visitors to log in with a user name and

14 password. (*Id.* at p. 872; see also Schleiffer Declaration, ¶ 24.)  Konop created a list of people,

15 including pilots and other employees of Hawaiian, who were eligible to access the website.

16 Pilots Gene Wong and James Gardner were included on this list. Hawaiian's vice president

17 obtained permission from two users of Konop's site, used their passwords and logins and

18 accessed the Konop's secure site over 30 times. . (*Id.*, at pp. 872-873.)

19        In rejecting Konop's claim under the Wiretap Act, the court held "that for a website

20 such as Konop's to be "intercepted" in violation of the Wiretap Act, it must be acquired during

21 transmission, not while it is in electronic storage.  This conclusion is consistent with the

22 ordinary meaning of "intercept," which is "to stop, seize, or interrupt in progress or course

23 before arrival."" (*Ibid*, at p. 878.) In narrowly defining the word "intercept," the court stated

24 that "... Congress did not intend for "intercept" to apply to "electronic communications" when

25 those communications are in "electronic storage."  Given this decision and no matter what

26 information CCI could have acquired from Hewitt's computers, CCI's claim under the Wiretap

27 Act must fail as a matter of law.

28

WOHL
SAMMIS
&PERKINS LLP
ATTORNEYS AT LAW
1006 4th St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax    (916) 447-6400

1    CCI's claim under the Stored Communications Act (SCA) is similarly deficient.  Under

2    the SCA, it is an offense to "intentionally access ... without authorization a facility through

3    which an electronic communication service is provided ... and thereby obtain ... access to a

4    wire or electronic communication while it is in electronic storage in such system." (18 U.S.C. §

5    2701(a)(1).) The SCA, however, excepts from liability any "conduct authorized ... by a user of

6    that service with respect to a communication of or intended for that user." (18 U.S.C. §

7    2701(c)(2).)  In <u>Konop</u>, the district court found that the exception in section 2701(c)(2) applied

8    because Hawaiian's vice president received consent to the use of Konop's website. In this case,

9    Hewitt does not deny that he accessed CCI's network.

10    Through discovery in this action CCI has been able to obtain the exact dates and times

11    that Hewitt accessed their site and were able to specifically "reconstruct what data Hewitt

12    accessed... (Schleiffer Declaration in support of CCI Motion for Default, ¶¶ 20-31.)   The

13    evidence however, shows that Hewitt was authorized to view CCI's network; that he was

14    specifically requested to access the network; and that CCI has not suffered any damages as a

15    result of his access. (Schleiffer Declaration in support of CCI Motion for Default, ¶ 21; Exhibit

16    B, Hewitt Deposition, pp. 345:21-348:8; Declaration of Robin K. Perkins, Esq., [Exhibit 1];

17    Exhibit 5, Komatsu Deposition, pp. 48:4-56:25, attached to Declaration of Christopher Wohl,

18    Esq.)

19    Tokako Komatsu is also a former employee of CCI.  (Exhibit 5, Komatsu Deposition,

20    pp. 8:2-9:18, attached to Declaration of Christopher Wohl, Esq.)   Ms. Komatsu resigned

21    effective July 11, 2003. (*Id.* pp. 37:2-38:17)   Ms. Komatsu specifically testified that she

22    accessed the CCI website after leaving CCI to assist CCI in various projects that she continued

23    to work on while at her new job.  She understood that it was with the express knowledge and

24    authorization of CCI President, Bob Schleifer. (*Id.* pp. 49:2-51:22) Other CCI employees were

25    also aware of Komatsu's access to the website and openly discussed it with her. (*Id.* pp. 51:23-

26    54:4)  Ms. Komatsu specifically testified that "all past employees have the password." (*Id.* p.

27    54:5-20)

28

WOHL
SAMMIS
&PERKINS LLP
ATTORNEYS AT LAW
1006 4th St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax   (916) 447-6400

1  This evidence presented by Hewitt establishes that he was *authorized* to access CCI's

2  website and that he is not liable under the SCA. At a minimum, this evidence would create a

3  triable issue of material fact. No matter what information was deleted or allegedly destroyed

4  off of Hewitt's computers, CCI cannot establish that is suffered any prejudice with regard to its

5  claim that Hewitt improperly accessed its website.

6        **6.) *Default Judgment Should Not Be Entered Against Hewitt on CCI's Claim***

7        ***for Breach of Confidentiality Agreement.***

8        By its Sixth Cause of Action, CCI claims that Hewitt violated a confidentiality

9  agreement which precluded Hewitt from disclosing the contents of "client surveys" conducted

10 by CCI. (CCI Complaint, ¶¶ 78-83.) These "client surveys" are the questionnaires that are

11 provided to CCI by their clients, which are then passed on to the CCI "dialers" who obtain

12 answer to the questions from the general public. (Exhibit 5, Komatsu Deposition, pp. 12:12-

13 13:14, attached to Declaration of Christopher Wohl, Esq.; Exhibit B; Hewitt Deposition, pp.

14 79:9-80:7; Exhibit D, Schleifer Deposition, p. 20:5-10, Attached to Declaration of Robin

15 Perkins, Esq., [Exhibit 1].) CCI, however, has not presented one shred of evidence to prove or

16 suggest that Hewitt ever disclosed client survey information to anyone at anytime. This is not

17 disputed.

18       **7.) *Default Judgment Should Not Be Entered Against Hewitt on CCI's Claim***

19       ***for Breach of Fiduciary Duty.***

20       The elements of a cause of action for breach of fiduciary duty are (1) the existence of a

21 fiduciary relationship; (2) its breach, and (3) damage proximately caused by that breach. (Pierce

22 v. Lyman (1991) 1 Cal.App.4th 1093, 1101.) A fiduciary or confidential relationship can arise

23 when confidence is reposed by persons in the integrity of others, and if the latter voluntarily

24 accepts or assumes to accept the confidence, he or she may not act so as to take advantage of

25 the other's interest without that person's knowledge or consent. (*Id.* at pp. 1101-1102.)

26       Matt Hewitt was given the *title* of Director of National Operations for CCI. Hewitt,

27 however, was merely an employee and *never* an officer, director or shareholder of CCI. There

28 is absolutely no evidence that he controlled the corporation or directed corporate policy. Given

WOHL
SAMMIS
&PERKINS LLP
ATTORNEYS AT LAW
1006 4th St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax   (916) 447-6400

1  these facts, CCI may not even be able to establish that a fiduciary relationship existed between

2  Hewitt and CCI. However, even if such a relationship could be established, CCI has not and

3  cannot prove that it was damaged by any acts of Hewitt. Just as importantly, CCI cannot prove

4  that it has suffered any prejudice as a result of the action with respect to this claim. As a result,

5  default judgment with regard to the claim for breach of fiduciary duty is unjustified.

6       **8.) *Default Judgment Should Not Be Entered Against Hewitt on CCI's Claim***

7       ***for Breach of Confidence.***

8       By its Tenth Cause of Action, CCI asserts a claim for "Breach of Confidence." In

9  addition to the specific duties of confidence owed by an agent, several California courts have

10 recognized an independent tort of "breach of confidence." (See, e.g., <u>Tele-Count Engineers, Inc.</u>

11 <u>v. Pacific Tel. & Tel. Co.</u> (1985) 168 Cal.App.3d 455, 462; <u>Faris v. Enberg</u> (1979) 97

12 Cal.App.3d 309, 321.) Under <u>Faris</u>, "[a]n actionable breach of confidence will arise when an

13 idea, whether or not protectable [under copyright] is offered to another in confidence, and is

14 voluntarily received by the offeree in confidence with the understanding that it is not to be

15 disclosed to others, and is not to be used by the offeree for purposes beyond the limits of the

16 confidence without the offeror's permission.... There must exist evidence of the communication

17 of the confidentiality of the submission or evidence from which a confidential relationship can

18 be inferred." (<u>Ibid.</u>, at p. 323.)

19      Clearly, CCI's claim for "breach of confidence" suffers from the same maladies as its

20 claims for breach of the confidentiality agreement and breach of fiduciary duties. At best, CCI

21 may be able to establish that Hewitt signed a confidentiality agreement with regard to client

22 surveys. Yet, CCI has *no* evidence that Hewitt divulged any information with regard to client

23 surveys to anyone at anytime. Accordingly, CCI cannot establish prejudice and any default

24 judgment with regard to this claim should not issue.

25      **(4) Public Policy Favors the Disposition of this Case on its Merits**

26      The fourth <u>Malone</u> factor to be considered is the "public policy favoring disposition of

27 cases on their merits." (<u>Malone v. United States Postal Service</u>, *supra,* 833 F. 2d 128, 130.)

28 Clearly this factor weighs heavily in favor of Defendants' having their opportunity to defend

WOHL
SAMMIS LLP
ATTORNEYS AT LAW
1006 4th St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax   (916) 447-6400

- 34 -

1  against CCI's claims before a jury on August 9, 2005.  As discussed above, CCI allegations are

2  thin and obtaining a default judgment and avoiding a case on the merits would be a windfall.

3  Moreover, a default judgment would permit CCI to obtain a certain multi-million dollar award

4  thereby putting Defendants' out of business and forcing bankruptcy.    (Declaration of

5  Christopher Wohl, Esq.)

6      **(5)  Less Drastic Sanctions are Available**

7      In determining whether a district court has properly considered the adequacy of less

8  drastic sanctions before dismissing a party's case, the court considers "(1) whether the district

9  court explicitly discussed the feasibility of less drastic sanctions and explained why such

10 alternate sanctions would be inappropriate; (2) whether the district court implemented

11 alternative sanctions before ordering dismissal; and (3) whether the district court warned the

12 party of the possibil`ity of dismissal before ordering dismissal. Adriana Int'l Corp., 913 F.2d at

13 1412-13."

14      **a.) *Magistrate Mueller Never Forewarned Hewitt Default Was Possible.***

15      The "failure to warn has frequently been a contributing factor in our decisions to reverse

16 orders of dismissal." (United States of America v. Kahaluu Construction Co, Inc. 857 F.2d 600

17 (9th Cir. 1988).)  Magistrate Mueller's May 20, 2004 Order never warns of harsher sanctions for

18 non-compliance nor is there any mention or reference to default for disobedience.    "The

19 significance of warning is that a sanction may be unfair if the party could not have realized that

20 it was in jeopardy of so severe a consequence if it was in error regarding its discovery posture."

21 (Valley Engineers Inc. v. Electric Engineering Company 158 F.3d 1051, 1057 (9th Cir. 1998).)

22      While warnings are not required in every case they certainly are the norm.  In Anheuser

23 Busch, Inc. v. Natural Beverage Distributors et al. (9th Cir. 1995) 69 F. 3d 337, 353, the case

24 upon which Magistrate Mueller heavily relies in her findings, dismissal of defendant

25 Beardslee's counter-claim against Anheuser Busch was upheld by the Ninth Circuit, in large

26 part, because the district court "did explicitly warn Beardslee that discovery misconduct or

27 violating its orders could result in serious repercussions, **including dismissal**."  The District

28 Court also "sternly cautioned Beardslee that she must abide by its pre-trial Publicity Order" and

WOHL
SAMMIS
&PERKINS LLP
ATTORNEYS AT LAW
1006 4th St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax   (916) 447-6400

1  "specifically stated that it had considered dismissing the case as a sanction for her misconduct."

2  These warnings all preceded dismissal in that action.

3      As evidenced by Magistrate Mueller's May 20, 2004 Order, Hewitt was never warned or

4  cautioned and had no idea default would result from his mistake.

5      **b.)  Magistrate Mueller Did Not Implement Alternative Sanctions Before**

6           **Ordering Default Against Defendants**

7      The court in <u>United States of America v. Kahaluu Construction Co, Inc.</u>, *supra,* 857

8  F.2d 600, 604, equated the implementation of alternative sanctions *prior* to handing down the

9  ultimate sanction of default with "progressive discipline" in the employer-employee context

10 (before ordering default there should be a "natural progression, much like progressive

11 discipline, with dismissal the last step." (*Ibid.*) Even though the Magistrate in <u>Kahaluu</u> did levy

12 a monetary sanction before entering dismissal, on review the District Court determined that

13 "[t]here was no natural progression" preceding dismissal. (*Ibid.*)

14     In <u>Adriana International Corp. v. Thoeren</u> 913 F.2d 1406 (9th Cir. 1990) default

15 sanctions imposed by the District Court were affirmed on appeal to the Ninth Circuit. <u>Adriana</u>

16 is helpful in pointing out the type of "alternative sanctions" rendered by the court *before*

17 delivering the ultimate sanction of default.  In <u>Adriana</u>, *before* ordering dismissal the District

18 Court imposed the following sanctions: "monetary sanctions for filing a frivolous motion, for

19 failure to comply with Local Rule 6, for failure to produce documents, and for failure to pay

20 earlier sanctions. Additionally, the court also found Lewis [Adriana's attorney Burke Lewis,

21 Esq.] in contempt for failing to pay the sanctions.  Adriana continually disobeyed court orders

22 and acted in willful disruption of the discovery process.  Adriana had not complied with past

23 sanctions, and the court had no reason to believe they would in the future." (*Id.* p. 1413)  Part

24 of the willful disobedience included Adriana's "repeated failure" to appear for depositions

25 despite being ordered to do so. (*Ibid*)  Adriana was also warned "twice" by the court that their

26 "discovery conduct was improper" and was separately cautioned that repeated violations "may

27 result in dismissal." (*Ibid.*)

28

WOHL
SAMMIS
&PERKINS LLP
ATTORNEYS AT LAW
1006 4th St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax    (916) 447-6400

- 36 -

1    _Adriana International Corp. v. Thoeren_ 913 F.2d 1406, *supra,* is instructive because it

2    not only explains the type of mischievous conduct that will trigger default or dismissal

3    sanctions but also because it illustrates how the District Court implements "progressive

4    discipline" before recommending the harshest sanction of default. (_United States of America v._

5    _Kahaluu Construction Co, Inc.,_ *supra,* 857 F.2d 600, 604).

6         Clearly, the willful disobedience and repeated violations of court orders, including the

7    fact that both Adriana and counsel were previously hit with monetary sanctions (not just once)

8    and found to be in contempt of court, called for the ultimate sanction of default.  However, in

9    contrasting Adriana's conduct with Hewitt's conduct clearly default is not warranted.  For

10    example, unlike Adriana, Hewitt did not repeatedly run afoul of court orders.  Hewitt was not

11    previously warned about his conduct (i.e., "deep trouble") and certainly not cautioned that

12    dismissal was possible like Adriana.  Hewitt was not held in contempt of court like Adriana.

13    Unlike Adriana, Hewitt did not willfully violate orders from a Special Master.  Unlike Adriana

14    Hewitt was not repeatedly sanctioned.  Unlike Adriana Hewitt *complied* with discovery by

15    appearing for two days of his deposition, making other Pacific Crest employees available for

16    their depositions, producing tens of thousands of documents, and providing straightforward and

17    complete responses to hundreds of interrogatories and requests for production.

18         Magistrate Mueller did not implement sufficient alternate sanctions nor did she

19    adequately caution Hewitt before ordering default and thus her findings and recommendations

20    should be rejected.

21         **c.)  Magistrate Mueller's Reliance on <u>Anheuser Busch, Inc.</u> in Deciding**

22              **Against Less Drastic Sanctions is Distinguished From the Instant Case**

23         In _Anheuser Busch, Inc. v. Natural Beverage Distributors,_ *supra,* 69 F. 3d 337, 352, the

24    case upon which Magistrate Mueller relies in determining that less drastic sanctions were not

25    available to Hewitt, is markedly distinguished from the facts in the instant case.  As the district

26    court explained in upholding the dismissal of Beardslee's counter-claim:

27         "Beardslee does not take her oath to tell the truth seriously and ... will say

28         anything at any time in order to prevail in this litigation.  There is little guarantee

WOHL
SAMMIS
&PERKINS LLP
ATTORNEYS AT LAW
1006 4ᵗʰ St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax  (916) 447-6400

- 37 -

1   that if the court were to impose lesser sanctions Beardslee's misconduct would

2   cease. Beardslee's pattern of deception and discovery abuse made it impossible

3   for the district court to conduct another trial with any reasonable assurance that

4   the truth would be available. It is appropriate to reject lesser sanctions where the

5   court anticipates continued deceptive misconduct." (Anheuser Busch, Inc. v.

6   Natural Beverage Distributors, *supra,* 69 F. 3d 337, 352.)

7          The Ninth Circuit upheld the dismissal of Beardslee's cross-claim "in light of

8   Beardslee's concealment of the documents for three years, her continuous denials under oath

9   that she knew the documents existed and were legible, her repeated violations of the court's

10  Publicity Order, and her violations of the court's in limine rulings, there is ample support for the

11  district court's conclusion that Beardslee's behavior illustrated such 'an abiding contempt and

12  continuing disregard for this court's orders' that dismissal was the only real alternative".

13  (Anheuser Busch, Inc. v. Natural Beverage Distributors, *supra,* 69 F. 3d 337, 352.)

14         The distinction between <u>Anheuser Busch</u> and the instant case is evident. The District

15  Court's dismissal of defendant Beardlee's action came only after there were "repeated

16  violations" of *several* court orders, concealing documents, lying under oath, and the conclusion

17  that Beardless would say and do anything (including lying under oath) to prevail. Based on

18  these facts, notably the determination that Beardslee would not change her dishonest and

19  cheating ways, the District Court ruled out less drastic sanctions.

20         Hewitt's single lapse in judgment does not rise to the level of egregious conduct

21  exhibited by Beardslee and therefore less drastic sanctions could have and should have been

22  given.

23                    **(i) *Less Drastic Sanctions Against Hewitt are Available.***

24         Even if the Court determines that Hewitt violated its May 20th Order there are certainly

25  less drastic and more appropriate sanctions that are available. The case of Kucala Enterprises v.

26  Auto Wax Company, Inc., 2003 U.S. District Lexis 19103, (2003) is on point and is also the

27  only federal decision that involves the claim that a party violated a court order by using

28  Evidence Eliminator.

WOHL
SAMMIS
&PERKINS LLP
ATTORNEYS AT LAW
1006 4th St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax   (916) 447-6400

- 38 -

1         In <u>Kucala Enterprises v. Auto Wax Company, Inc.</u>, 2003 U.S. District Lexis 19103,

2    *supra,* the combined "Kucala" plaintiffs (collectively referred to herein as "plaintiff") admitted

3    buying Evidence Eliminator *after* litigation commenced because he knew it would "defeat

4    discovery" efforts in the case and "that is what he intended" to use it for. (*Id.* p. 9) After

5    purchasing Evidence Eliminator, but before using it to delete evidence, Plaintiff admits that he

6    discussed using it with his attorney and that he was advised not to use it. (*Id.* p. 9) Despite his

7    attorney's admonition, plaintiff installed and ran Evidence Eliminator for the admitted purpose

8    of deleting evidence. (*Id.* p. 10)

9         The Magistrate in <u>Kucala</u> found, and the District Court agreed, that Plaintiff's wholesale

10   destruction of evidence precluded defendant from establishing its "claims for contributory

11   infringement and inducement of infringement and unable to establish its damages..." (<u>Kucala</u>

12   <u>Enterprises v. Auto Wax Company, Inc.</u>, 2003 U.S. District Lexis 19103, *supra* p. 17) The

13   District Court observed that plaintiff not only ***admitted*** destroying relevant documents with

14   Evidence Eliminator, plaintiff was also found to have "resisted [discovery efforts] at every

15   turn", *Id.* p. 17). For example, plaintiff tampered with documents that were produced in an

16   attempt to "foil" defendants' discovery efforts and only produced two customer invoices even

17   though he had 200 customers, which prevented defendants from obtaining critical discovery on

18   damages. (*Id.* p. 16) During his deposition plaintiff also "claimed lack of memory about"

19   important matters in the case, which the Magistrate disbelieved. (*Id.* p. 16)

20        Based on plaintiff's admission that he purchased Evidence Eliminator to delete evidence

21   (including <u>all</u> evidence relative to defendant's claim of damages against plaintiff) and to

22   frustrate discovery efforts, because he knew there was a court order requiring him to produce

23   documents (including information on his computer hard drives), because plaintiff rejected the

24   advice of his lawyer to not use Evidence Eliminator, because plaintiff tampered with documents

25   with the intent to "foil" discovery, because the court determined that plaintiff deleted evidence

26   (including the invoices relating to the 200 customers) and based on the insincerity of plaintiff's

27   "claimed lack of memory", the Magistrate concluded that plaintiff's conduct was "egregious

28   and in flagrant disregard of a court order." (<u>Kucala Enterprises v. Auto Wax Company, Inc.</u>,

WOHL
SAMMIS
&PERKINS LLP
ATTORNEYS AT LAW
1006 4th St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax  (916) 447-6400

- 39 -

1  *supra,* 2003 U.S. District Lexis 19103, at p. 16)  The Magistrate therefore recommended that

2  plaintiff's "claims be dismissed and that attorneys' fees and expenses" attributable to the

3  motion be awarded.  (*Id.* p. 3)

4  Plaintiff filed 27 pages of objections to the Magistrate's recommendation of dismissal.

5  (Kucala Enterprises v. Auto Wax Company, Inc., *supra,* 2003 U.S. District Lexis 19103, at p. 3)

6  The District Court reviewed the objections under the applicable *de novo* standard of review.

7  After reviewing plaintiff's objections, the District Court rejected the Magistrate's

8  recommendation of dismissal believing that "the interests of justice is served by the

9  adjudication" of the claims "on the merits."  (*Id.* p. 20)  In rejecting the Magistrate's

10  recommendation of dismissal the District Court instead fashioned a lesser sanction that allowed

11  "the case to go forward" while warning plaintiff that any further misconduct *could* result in a

12  default judgment. (*Id.* p. 20).  The lesser sanction ordered by the District Court gave defendant

13  the opportunity to present evidence that plaintiff willfully destroyed documents by using

14  Evidence Eliminator, which the jury could consider for both causation <u>and</u> damages.  (*Ibid.*)

15  Kucala is instructive.  Unlike the plaintiff in Kucala, Hewitt recognizes that he made an

16  error in judgment when using privacy protection software on the hard drives before they were

17  produced.  The plaintiff in Kucala, on the other hand, expressed zero remorse, *admitted* buying

18  Evidence Eliminator to delete evidence and defeat discovery efforts, and in fact deleted

19  evidence from the computer hard drive—there is *no* evidence that Hewitt intended to or in fact

20  deleted any evidence in this case.  Unlike the plaintiff in Kucala Hewitt did not discuss with

21  counsel his intent to use Evidence Eliminator and was therefore not advised against it.  Hewitt,

22  unlike the plaintiff in Kucala, never lied during his deposition nor has there been any

23  determination that Hewitt was untruthful.  Unlike the plaintiff in Kucala Hewitt did not falsify

24  evidence nor did he purposely delete all evidence relative to damages (claimed by CCI).  In

25  fact, just the opposite is true; Hewitt has produced from his computer hard drives *each and*

26  *every invoice* evidencing payments received from *each and every* client, including the five so-

27  called former CCI clients.

28  Based, in part, in the guidance offered in Kucala Enterprises v. Auto Wax Company,

WOHL
SAMMIS
&PERKINS LLP
ATTORNEYS AT LAW
1006 4th St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax   (916) 447-6400

- 40 -

1  Inc., *supra,* 2003 U.S. District Lexis 19103, *supra,* Hewitt respectfully asks this Honorable

2  Court to reach a similar harsh but fair sanction such as a negative inference instruction and/or

3  allowing CCI the opportunity to present evidence of Hewitt's conduct for the purpose of

4  establishing liability and damages.   The interests of judgment will be served by imposing a

5  lesser sanction thereby allowing the jury to decide this case on the merits rather than on

6  Hewitt's grievous mistake.

7      **D.   Only "Reasonable" Attorney's Fees and Costs Should be Considered—The**

8          **$145,811.75 Claimed by CCI is Clearly Excessive and Unreasonable**

9      When seeking an award of attorney's fees under Rule 37(b) the moving party must first

10  show that requested attorney's fees are reasonable. (*Toth v. Trans World Airlines, Inc.,* 862 F.2d

11  1381, 1386 (9th Cir. 1988) [award of fees remanded in part because there was "no evidence in

12  the record to indicate that the rates claimed were reasonable or that they were comparable with

13  prevailing rates in the community."]) Although an award of attorney's fees may be based upon

14  the affidavits of counsel, the evidence presented must be "detailed enough to allow the court to

15  consider all the factors necessary to set the fee." (*Williams v. Alioto,* 625 F.2d 845, 849 (9th Cir.

16  1980)) "The affidavits must provide sufficient information to enable the court to clearly

17  establish for the record that the fees demanded are caused by the noncomplying conduct and

18  that they are reasonable." (*Toth, supra,* 862 F.2d at 1386) A declaration by counsel should

19  include the specific nature of services rendered, the prevailing rate, and the hours of attorney

20  time. (*Ibid*)

21      CCI claims it has incurred over $145,000 in attorney's fees and costs on this current

22  motion for sanctions.   This claim is patently unreasonable and must not be allowed.   When

23  CCI first attempted to justify its request for attorney's fees, Magistrate Mueller originally

24  sustained Hewitt's objections to the claimed fees and costs.   However, Magistrate Mueller

25  ordered CCI to submit the actual billing statements within twenty days.   CCI failed to comply

26  with this order.   Instead, CCI once again provided an alleged summary of the billing statements.

27  At that time, CCI also conceded that it previously included erroneous hourly billing rates for

28  "the attorneys and staff working on this matter" and that it had significantly overstated the fees

WOHL
SAMMIS
&PERKINS LLP
ATTORNEYS AT LAW
1006 4th St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax   (916) 447-6400

- 41 -

1 requested. (See Declaration of Michael J. Daponde in Support of Request for Attorneys Fees,

2 ¶3.[13])

3      Hewitt once again objected to the billing summary and all evidence offered to support

4 CCI's claim for attorneys fees and costs. (See Defendant's Objections to Declaration of Michael

5 J., Daponde.) In lieu of sustaining the objections, Magistrate Mueller gave CCI a "third bite at

6 the apple" by permitting CCI to submit unredacted copies of billing records for *in camera*

7 review. Based upon the *in camera* review, Magistrate Mueller determined that the "... billing

8 records are sufficiently detailed and the amount billed reasonable ... " and recommended that

9 Hewitt pay $145,811.75 in attorneys fees and costs.

10      CCI's request for $145,811.75 in attorney's fees and costs, however, is grossly

11 excessive and inflated. When seeking an award of attorney's fees under Rule 37(b) the moving

12 party must first show that requested attorney's fees are reasonable. (Toth v. Trans World

13 Airlines, Inc., 862 F.2d 1381, 1386 (9th Cir. 1988) [award of fees remanded in part because

14 there was "no evidence in the record to indicate that the rates claimed were reasonable or that

15 they were comparable with prevailing rates in the community."]) Although an award of

16 attorney's fees may be based upon the affidavits of counsel, the evidence presented must be

17 "detailed enough to allow the court to consider all the factors necessary to set the fee."

18 (Williams v. Alioto, 625 F.2d 845, 849 (9th Cir. 1980)) "The affidavits must provide sufficient

19 information to enable the court to clearly establish for the record that the fees demanded are

20 caused by the noncomplying conduct and that they are reasonable." (Toth, *supra,* 862 F.2d at

21 1386) A declaration by counsel should include the specific nature of services rendered, the

22 prevailing rate, and the hours of attorney time. (Ibid.)

23      "When the sanctions award is based upon attorney's fees and related expenses, an

24 essential part of determining the reasonableness of the award is inquiring into the

25 reasonableness of the claimed fees." (In Re Yagman 796 F.2d 1165, 1184-85 (9th Cir.1986)

26 [district court erred by among other things, failing to consider party's "ability to pay such an

27 immense sum which, in our view, is another factor relevant in determining reasonableness.")

28

[13]Defendants ask the Court to take judicial notice of Mr. Daponde's Declaration.

WOHL
SAMMIS
&PERKINS LLP
ATTORNEYS AT LAW
1006 4th St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax   (916) 447-6400

- 42 -

1  The court must make some evaluation of the fee breakdown submitted by counsel. (*Id.* at p.

2  1185.) The court should consider "not actual expenses and fees but those the court determines

3  to be reasonable." (*Ibid*) Implicit in this is the duty to mitigate. In assessing the damage done,

4  the court should consider the extent to which it is self-inflicted due to the failure to mitigate ...."

5  (*Ibid*)

6    Although Hewitt has never been afforded the opportunity to challenge the specific fees

7  and costs incurred because billing records have not been produced, it appears clear that both the

8  hourly rates and claimed hours are excessive.  Even at the "corrected" hourly rate, Ben

9  Webster's billing rate for this case is $365.00 per hour (in another "mistaken" Declaration, this

10 one on April 30, 2004, Mr. Daponde declares that Mr. Webster rate is $430 per hour on this

11 case[14]). (Daponde Declaration, Exhibit 1.) The "corrected" hourly rate for Mike Daponde, who

12 has been practicing for about 6 years, is $323.00 per hour (in another "mistaken" Declaration

13 Mr. Daponde claims to charge $360 per hour on this case). (Daponde Declaration, Exhibit 1.)

14 The rates do not comport with the prevailing rate in Sacramento and are unwarranted.  Notably,

15 Magistrate Mueller never remarked on the fact that CCI's counsel submitted not one but two

16 declarations under penalty of perjury claiming what they CCI's counsel now admits were

17 erroneous billing rates.

18    In addition, the total claimed hours is excessive.  CCI has charged time for 5 different

19 staff members working on this case.  This included 3 different attorneys and 2 paralegals.  Yet,

20 no consideration appears to have been made as to whether there was any duplication or

21 redundant time charged.  All of the work performed by Ben Webster, Carrie Bonnington and

22 the paralegals appears to be duplicative.  Another blatant example of duplication appears to be

23 the charge of $4,760 for work performed by paralegal Octavio Filippini.  CCI attempts to

24 charge for his work at $170 per hour for analyzing the hard drives.  CCI also charges for this

25 same work by their expert witness. Menz.  Unbelievably, CCI charges more per hour for their

---

[14] The Court is asked to take Judicial Notice of the April 30, 2004 declaration of Michael Daponde, Esq., wherein Mr. Daponde declares under penalty of perjury in support of monetary sanctions that Mr. Webster's "hourly rate on this matter is $430", that Mr. Daponde's rate is "$360" an hour, and first-year lawyer Ms. Bonnington's rate on this case is "$250" per hour.  These rates were again included in Mr. Daponde's Declaration in support of CCI's Motion for Sanctions.  Only after Magistrate Mueller sustained Defendants' objections did Mr. Daponde indicate in a supplemental Declaration that his two prior sworn declarations relative to billing rates were erroneous.

WOHL
SAMMIS
&PERKINS LLP
ATTORNEYS AT LAW
1006 4th St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax   (916) 447-6400

- 43 -

1    paralegal then for the work performed by the computer expert who testified at the evidentiary

2    hearing.

3        CCI also cannot establish that they used reasonable efforts to mitigate their claim for

4    fees.  For example, rather than simply ask Hewitt's counsel if they had any of the files or

5    folders that CCI claims were destroyed, or asking for assistance or clarification in obtaining

6    these files, CCI's counsel instead rushed to spend in excess of $100,000 in fees and costs to file

7    this Motion. (See FRCP, Rule 37(a)(4)(A).)  Had CCI made even the slightest effort to resolve

8    these issues, the Motion may never have been filed. At a minimum, CCI would have reduced

9    the amount of attorney's fees and costs expended.

10        CCI should not be rewarded for their obvious attempt to take advantage of Hewitt's

11    legitimate, albeit misguided, effort to preserve his privacy rights.  If CCI were truly interested in

12    a trial on the merits their counsel would have simply called Hewitt's counsel to inquire about

13    the files CCI claims were destroyed by Hewitt.  At that time, Hewitt would have informed CCI

14    that they already had the files claimed to have been destroyed in their possession.  If Hewitt no

15    longer had possession of any files or documents, he would have made every effort to insure that

16    CCI obtained copies of theses documents and files.

17        Moreover, CCI had every opportunity during his depositions to ask Hewitt specific

18    questions with regard to the EE Log but failed to do so.  In fact, CCI never even showed Hewitt

19    the EE Log at his deposition even though they had it.  (Exhibit B, Hewitt Deposition, 424:15-

20    431:21, Exhibit 1)  CCI dodged the important questions at issue in their Motion and instead

21    merely asked Hewitt whether files called "bids" and "monthly schedule" contained personal and

22    private information.  (Hewitt Deposition, 426:18:427:23, Exhibit B *supra*)  Had CCI simply

23    asked Hewitt what the references were in the EE Log to "DBR Bids," "KIL1130" and files

24    named "KC24177 Dispo 07-11-04.doc," "KC24177 Dispo 07-12-04.doc," "KC24177 Marginal

25    07-11-04.doc" (i.e., the files that CCI repeatedly claims in their Motion that Hewitt destroyed)

26    Hewitt would have explained that these were merely references to *"links"* from his laptop to the

27    Sun server.  Hewitt would have explained that these files were never deleted, are still located on

28

WOHL
SAMMIS
&PERKINS LLP
ATTORNEYS AT LAW
1006 4th St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax   (916) 447-6400

- 44 -