1 the Sun server. More importantly, Hewitt would have explained that these files were already
2 produced to CCI.

3       If CCI believed that Hewitt's answers in deposition did not respond to their specific
4 concerns that files were deleted or destroyed they could have and should have discussed the
5 matter with counsel before filing this motion. Instead, before filing this motion CCI's counsel
6 undertook no effort to corroborate the opinion from their so-called expert by simply asking
7 Hewitt or Hewitt's counsel. Had they done so, CCI may have been spared the $145,000 invoice
8 charged by their counsel in preparing the Motion. (See Request for Judicial Notice,
9 Declarations of Robin K. Perkins, Esq., and Christopher Wohl, Esq..)

10      For all of the reasons, CCI's request for over $145,000 in attorney's fees and costs is
11 unreasonable and should not be allowed.

12

13                          **IV.    CONCLUSION**

14      Hewitt did not willfully or knowingly violate Magistrate Mueller's Discovery Order.
15 CCI has the documents which they claim were destroyed and yet uses Hewitt's misguided
16 attempt to use privacy software as a catalyst to win this case.  CCI must not be allowed to take
17 unfair advantage of Hewitt's poor judgment to avoid a fair trial on the merits.  It is clear that
18 lesser sanctions are available and should have been considered in lieu of terminating sanctions.

19      Finally, the award of $145,811.75 in attorney's fees and costs should be should stricken
20 or at least reduced to a reasonable sum.

21 DATED: April 25, 2005.            **WOHL SAMMIS & PERKINS LLP**

22

23

24                                  By_____
                                    Christopher Wohl
25                                  Attorneys for Defendants

26

27

28

WOHL
SAMMIS
&PERKINS LLP
ATTORNEYS AT LAW
1006 4th St. Fourth Floor
Sacramento, CA 95814
Phone (916) 446-2000
Fax  (916) 447-6400

- 45 -

1  Robin K. Perkins, SBN 131252
   Christopher F. Wohl, SBN 170280
2  **WOHL SAMMIS & PERKINS LLP**
   1006 4th Street, Fourth Floor
3  Sacramento, California 95814
   Telephone: (916) 446-2000
4  Facsimile: (916) 447-6400

5
   Attorneys for Defendants,
6  MATTHEW J. HEWITT and
   PACIFIC CREST RESEARCH CORPORATION
7

**ORIGINAL**
**FILED**

**NOV 1 7 2004**

CLERK U S DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

DEPUTY CLERK

8                 UNITED STATES DISTRICT COURT

9              EASTERN DISTRICT OF CALIFORNIA

10

11  COMMUNICATIONS CENTER, INC.          **CASE NO. CIV-S-03-1968 WBS KJM**

12          Plaintiff,                   **DECLARATION OF ROBIN
                                         PERKINS, ESQ., IN SUPPORT OF**
13      v.                               **DEFENDANTS' OPPOSITION TO
                                         PLAINTIFF'S MOTION FOR FRCP**
14  MATTHEW J. HEWITT, and PACIFIC       **RULE 37 SANCTIONS; REQUEST
    CREST RESEARCH CORPORATION           FOR SANCTIONS PURSUANT TO**
15                                       **FRCP RULE 37 AGAINST PLAINTIFF
            Defendants.                  AND THEIR ATTORNEY OF**
16                                       **RECORD.**

17

18      I, Robin K. Perkins, declare:

19      1.      I am an attorney at law in good standing, duly admitted to practice before the

20  courts of this state and before the United States District Court, Eastern District, and, at all times

21  herein relevant, am the attorney of record for Defendants Pacific Crest Research Corporation

22  and Matt Hewitt.

23      2.      True and correct copies of excerpts taken from the deposition of Takako

24  Komatsu are attached hereto as Exhibit A.

25      3.      True and correct copies of excerpts taken from the deposition of Matthew

26  Hewitt are attached hereto as Exhibit B.

27      4.      True and correct copies of excerpts taken from the deposition of Wally Clinton

28  are attached hereto as Exhibit C.

WOHL
SAMMIS
PERKINS LLP
ATTORNEYS AT LAW
1006 St. Fourth Floor
Sacramento, CA 95814
(916) 446-2000
(916) 447-6400

DECLARATION OF ROBIN K. PERKINS, ESQ. IN OPPOSITION TO PLAINTIFF'S MOTION FOR
DISCOVERY SANCTIONS; REQUEST FOR SANCTIONS AGAINST CCI AND THEIR COUNSEL

1      5.     True and correct copies of excerpts taken from the deposition of Robert

2 Schleifer are attached hereto as Exhibit D.

3      6.     True and correct copies of excerpts taken from the deposition of Steve Lawson

4 are attached hereto as Exhibit E.

5      7.     True and correct copies of excerpts taken from the deposition of Don Yesnik are

6 attached hereto as Exhibit F.

7      8.     True and correct copies of excerpts taken from the deposition of Dave Prather

8 are attached hereto as Exhibit G.

9      9.     True and correct copies of excerpts taken from the deposition of Christine

10 Griffin are attached hereto as Exhibit H.

11     10.     True and correct copies of excerpts taken from the deposition of Ann Selzer are

12 attached hereto as Exhibit I.

13     11.     True and correct copies of excerpts taken from the deposition of Patty

14 McDowell are attached hereto as Exhibit J.

15     12.     True and correct copies of excerpts taken from the deposition of Dave Binder

16 are attached hereto as Exhibit K.

17     13.     A true and correct copy of the CCI confidentiality agreement is attached hereto

18 as Exhibit L.

19     14.     A true and correct copy of the CCI employment engagement letter is attached

20 hereto as Exhibit M.

21     15.     A true and correct copy of the CCI employment engagement letter is attached

22 hereto as Exhibit N.

23     16.     A true and correct copy of the CCI employment engagement letter is attached

24 hereto as Exhibit O.

25     17.     A true and correct copy of the June 20, 2003 email between Schleifer and

26 Hewitt is attached hereto as Exhibit P.

27     18.     A true and correct copy of the August 2003 email between Schleifer and Clinton

28 is attached hereto as Exhibit Q.

WOHL
AMMIS
ERKINS LLP
NEYS AT LAW
1 St. Fourth Floor
ento, CA 95814
916) 446-2000
916) 447-6400

DECLARATION OF ROBIN K. PERKINS, ESQ. IN OPPOSITION TO PLAINTIFF'S MOTION FOR
DISCOVERY SANCTIONS; REQUEST FOR SANCTIONS AGAINST CCI AND THEIR COUNSEL

19. On or about December 22, 2003, I am aware that CCI issued a Subpoena to Microsoft Corporation seeking electronic data and other information relating to Hewitt.

20. On or about March 19, 2004, I am aware that Defendants hand-served on CCI's counsel documents identified as DEF 1135 through DEF 5040.

21. On or about April 2, 2004, I am aware that Defendants caused to be hand-served on CCI's counsel documents identified as DEF 00001 through DEF 1134.

22. On or about April 21, 2004, I am aware that Defendants caused to be hand-served on CCI's counsel documents identified as DEF 5041 through DEF 5255.

23. On or about May 7, 2004, I am aware that Defendants caused to be hand-served on CCI's counsel documents identified as DEF 5257 through DEF 5464. I am also aware that on or about this date Defendants served more than 1100 pages from business directories that CCI requested—these documents were not stamped.

24. On or about May 14, 2004 I am aware that CCI issued Subpoenas to former CCI employees Tokako Komatsu, Dave Prather and to "Prather Consulting" seeking, among other things, electronic data including emails and other documents that refer or relate to Hewitt.

25. I am aware that on May 20, 2004, this Court ordered that Hewitt produce a "compact disc containing mirror images of any hard drives of the computers in defendants' possession that contain documents responsive to plaintiff's request for production of documents."

26. On or about May 28, 2004, I am aware that Hewitt caused to be hand-served on CCI's counsel a compact disc containing responsive documents in compliance with this Court's Order.

27. On or about June 2, 2004, I am aware that Hewitt caused to be hand-served on CCI's counsel documents identified as DEF 5465 through DEF 5498.

28. On or about June 7, 2004, I am aware that Hewitt caused to be hand-served on CCI's counsel more than 20,700 responsive documents that were not identified by Bates Stamp.

29. On or about June 18, 2004 I am aware that CCI issued a Subpoena to AAA

VOHL
.MMIS
ERKINS LLP
NEYS AT LAW
St. Fourth Floor
nto, CA 95814
16) 446-2000
16) 447-6400

- 3 -

DECLARATION OF ROBIN K. PERKINS, ESQ. IN OPPOSITION TO PLAINTIFF'S MOTION FOR DISCOVERY SANCTIONS; REQUEST FOR SANCTIONS AGAINST CCI AND THEIR COUNSEL

1 | Auto Club South, former CCI employee Takako Komatsu's employer, seeking, among other

2 | things, electronic data including emails and other documents that refer or relate to Hewitt

3 | and/or CCI. CCI received responsive documents.

4 |       30.    On or about June 21, 2004, I am aware that Hewitt caused to be hand-served on

5 | CCI's counsel documents identified as DEF 5499 through DEF 5506.

6 |       31.    On or about June 28, 2004, I am aware that CCI's counsel advised in a letter

7 | that he believed the compact disc produced by Hewitt did not contain all of the information

8 | stored on the hard drive including the "operating system" and "program subdirectories."

9 |       32.    On or about July 6, 2004, I am aware that counsel for Hewitt hand-delivered 10

10 | compact discs that were believed to be "mirrors" of relevant computer hard drives.

11 |       33.    On or about July 8, 2004 I am aware that CCI issued subpoenas to Patty

12 | McDowell (Vice President at Socratic Technologies) and Dave Binder (President of Binder

13 | Research) seeking, among other things, electronic data including emails and other documents

14 | that refer or relate to Hewitt.

15 |       34.    On or about July 12, 2004, I am aware that CCI's counsel claimed in a letter

16 | that Defendants' use of a software program (called "Ghost") to copy information from their

17 | computer hard drives was not a "forensically captured mirror". CCI proposed sending their

18 | computer expert to Defendants' office to examine and copy information from Defendants'

19 | computer hard drives. On behalf of Hewitt, our office did not object.

20 |       35.    On or about July 21, 2004, I am aware that my office caused two copied hard

21 | drives to be hand-delivered to CCI's counsel in compliance with this Court's May, 2004 Order.

22 | One of the hard drives provided by CCI's computer expert to make the "mirror" was defective

23 | and was returned to CCI's counsel. CCI provided another hard drive. Defendants' delivered to

24 | CCI's counsel the third and final copied hard drive in August 2004.

25 |       36.    On or about July 30, I am aware that CCI issued a Subpoena to Christine Griffin

26 | (Vice President at Kiley & Company) seeking, among other things, electronic data including

27 | emails and other documents that refer or relate to Hewitt.

28 |       37.    On or about August 3, 2004, I am aware that Defendants caused to be hand-

NOHL
AMMIS
ERKINS LLP
NEYS AT LAW
St. Fourth Floor
nto, CA 95814
916) 446-2000
916) 447-6400

DECLARATION OF ROBIN K. PERKINS, ESQ. IN OPPOSITION TO PLAINTIFF'S MOTION FOR
DISCOVERY SANCTIONS; REQUEST FOR SANCTIONS AGAINST CCI AND THEIR COUNSEL

1   served on CCI's counsel documents identified as DEF 5507 through DEF 5525.

2       38.    On or about October 8, 2004 I am aware that CCI issued a Subpoena to Selzer

3   & Company seeking, among other things, "Electronic Data" including emails and other

4   documents that refer or relate to the parties in this case.

5       39.    On or about October 12, 2004 I am aware that CCI issued a Subpoena to Level

6   3 Communications seeking, among other things, all electronically stored information from

7   "Internet Protocol" addresses that relate in any way to Defendants.

8       40.    The first time that I learned that CCI believed that my client, Matt Hewitt,

9   deleted files was during Mr. Hewitt's recent deposition. However, Mr. Daponde never asked

10  me to find out if any relevant files were deleted including the four files that are prominently

11  mentioned in his Motion (files identified as "KC24177 Dispo 07-11-04.doc," "KC24177 Dispo

12  07-12-04.doc," "KC24177 Marginal 07-11-04.doc.)   Had Mr. Daponde told me that he

13  believed relevant documents were deleted, inadvertently or otherwise, I would have discussed

14  the matter with my partner Christopher Wohl, Esq., our client and, if necessary, our computer

15  expert.  Only after receiving CCI's Motion on October 27, 2004 did I learn that CCI claimed

16  specific and relevant files were deleted.  I am informed and believe, through our expert Greg

17  Caouette and my client, that CCI's claims are false and that these documents are on the

18  mirrored hard drives produced to CCI.   However, at no time prior to receiving CCI's Motion

19  did anyone from Mr. Daponde's firm, including Mr. Daponde, ever make any attempt to

20  discuss these issues with me.

21      41.    I graduated from University of the Pacific, McGeorge School of Law in May

22  1987. I was admitted to the California State Bar and admitted to practice in the United States

23  District Court, Eastern District of California in December 1987. I have almost 17 years

24  experience defending and prosecuting business litigation claims, including trade secret claims.

25  I have tried numerous cases in both state and federal court. My current hourly rate is $275.00

26  per hour.

27      42.    Our firm utilizes daily timesheets to record attorney time spent on each case to

28  the tenth of an hour.  It is my practice and the practice of this firm to enter all time on a daily

WOHL
LAMMIS
PERKINS LLP
ORNEYS AT LAW
1 St. Fourth Floor
mto, CA 95814
916) 446-2000
916) 447-6400

- 5 -

DECLARATION OF ROBIN K. PERKINS, ESQ. IN OPPOSITION TO PLAINTIFF'S MOTION FOR
DISCOVERY SANCTIONS; REQUEST FOR SANCTIONS AGAINST CCI AND THEIR COUNSEL

1   basis. I have reviewed my daily timesheets and am aware that the information recorded therein

2   is true and accurate. The CCI Motion and attachments are voluminous. I, along with my

3   partner Christopher Wohl, Esq., spent a considerable amount of time preparing the Opposition

4   and related pleadings. Since receiving CCI's Motion on or about October 27, 2004 I have

5   worked a total of 61.5 hours in researching, drafting and preparing the Opposition to CCI's

6   Motion (including pleadings related to the Opposition). At $275.00 per hour, I am aware that

7   the total fees for my work in preparing the Opposition are $16,912.50. This does not include

8   time spent reviewing CCI's Reply or attending the hearing, which I estimate will take an

9   additional 10 hours, bringing the total amount to $19,662.50. Because CCI's Motion for

10  Sanctions was filed without substantial justification, I believe an award of monetary sanctions

11  against CCI and/or their counsel of record pursuant to FRCP, Rule 37(a)(4)(B) is warranted in

12  the total amount of $41,087.50 (which includes my fees of $19,662.50 plus Christopher Wohl,

13  Esq.'s fees of $21,425.00).

14       I declare under penalty of perjury under the laws of the State of California that the

15  foregoing is true and correct; that I have personal knowledge of the same, and if called as a

16  witness I could competently testify thereto. Executed this 17th day of November 2004, at

17  Sacramento, California.

Respectfully submitted,

ROBIN K. PERKINS, ESQ.

18
19
20
21
22
23
24
25
26
27
28

VOHL
MMIS
:RKINS LLP
IEYS AT LAW
St. Fourth Floor
1to, CA 95814
16) 446-2000
16) 447-6400

- 6 -

# EXHIBIT A

Page 1

1            UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF CALIFORNIA
2            CASE NO. CIV-S-03-1968 WBS KJM

3

4    COMMUNICATIONS CENTER, INC.,        COPY

5              Plaintiff,

6    -vs-

7    MATTHEW J. HEWITT and PACIFIC CREST
     RESEARCH CORPORATION,

8

              Defendants.

9                                    /

10

11            DEPOSITION OF TAKAKO KOMATSU

12

13

              Monday, October 25, 2004
14             9:05 a.m. - 1:05 p.m.

15

              444 Seabreeze Boulevard
16                 Suite 740
              Daytona Beach, Florida

17

18

19

20

21

22

     Reported By:
23   Carmen J. Thomas, RPR
     Notary Public, State of Florida
24   Esquire Deposition Services
     Daytona Beach Office Job # 676139

25

1   clients that you recall having that relationship

2   with?

3       A    I know for definitely Ann Selzer, that

4   was one of the primary ones.  In terms of the other

5   ones, I'm quite -- I'm confused because in the end

6   we rotated the client services role and I jumped in

7   on any projects, so I can't remember which

8   specifically.

9       Q    Okay.  Now, when you started working at

10  CCI, do you recall signing -- let's mark this next

11  one as --

12          (Exhibit 2 was marked for

13      identification.)

14          MR. WOHL:  Mike, my copies are sporadic.

15      I'll show them to you.  It's stuff I already

16      have.  Exhibit 2 has been marked as the -- a

17      confidentiality agreement signed by Matt

18      Hewitt on CCI stationery dated May 17, 1999.

19  BY MR. WOHL:

20      Q    Do you recall signing a document like

21  this when you started working at CCI?

22      A    I don't recall.  It's possible but I

23  don't remember.

24      Q    In your capacity working at CCI for four

25  years, have you heard the term survey used before?

1      A      Yes.   It's a very common word for us to

2      use.

3      Q      Do you see in the first sentence or first

4      line of this document states, recognizing the

5      confidentiality of the surveys conducted by

6      Communication Center, Inc.  Do you understand what

7      the term survey means in that context?

8                MR. DUPONDE:  Objection.  Calls for

9            speculation.  Calls for a legal conclusion.

10     BY MR. WOHL:

11     Q      You can answer.

12     A      Oh, okay.  Surveys are the questionnaires

13     that's provided by our clients to administer on the

14     telephone.

15     Q      I should have also mentioned as part of

16     my explanation of the deposition process,

17     Mr. DuPonde and I will have a chance to make

18     objections for the record.  That's nothing --

19     nothing really to do with what you're testifying

20     about, but --

21     A      I do need to answer the questions even if

22     there is an objection from either side?

23     Q      Yeah, yes.  After Mr. DuPonde and I have

24     made an objection for the record then you can go

25     ahead and answer the question if you have it in

 1    Hewitt program jobs for certain clients?

 2        A    No.   Only concern that Bob has told me is

 3    that he was concerned for the hours of work that he

 4    was putting into it.

 5        Q    The hours of work by Steve Lawson?

 6        A    Into Matt's set up.

 7        Q    Are you aware if Mr. Lawson was paid for

 8    his time in helping with Mr. -- helping Mr. Hewitt?

 9            MR. DUPONDE:   Calls for speculation.

10            THE WITNESS:   Yes.   Bob felt that

11        everybody should be able to be an

12        entrepreneur themselves and he was saying

13        that Matt paid Steve Lawson to do the set up

14        for him.

15    BY MR. WOHL:

16        Q    Aside from Mr. Schleifer telling you

17    about Mr. Lawson doing work for Matt Hewitt's

18    company, did anybody else at CCI discuss that with

19    you?

20        A    Can you repeat the question.

21        Q    Sure.   Aside from Mr. Schleifer telling

22    you about the work that Mr. Lawson was doing for

23    Pacific Crest and Matt Hewitt, did anybody else at

24    CCI talk to you about the work that Mr. Lawson was

25    doing for CCI -- I'm sorry -- for Pacific Crest and

1    Matt Hewitt?

2        A    After Dave Prather started to work for

3    Pacific Crest I heard about the things that Steve

4    Lawson had done for Pacific Crest.

5        Q    Okay.  When do you believe that

6    Mr. Prather began working for Pacific Crest?

7        A    I think it was probably June of 2003.

8        Q    And how did you learn that Dave Prather

9    was working for Pacific Crest?

10       A    After Dave was demoted to an hourly

11   position because of a domestic dispute, Bob and I,

12   both of us encouraged him to contact Matt and start

13   doing work for him so that he could start having

14   his own business, get to start his own business.

15       Q    Okay.  You were talking about a domestic

16   issue, is that having to do with his exwife?

17       A    Yes -- well, exgirlfriend.

18       Q    Exgirlfriend.

19       A    That was in May.

20       Q    Did Bob Schleifer discuss with you

21   Mr. Schleifer's recommendation that Dave Prather

22   should do some consulting work for Matt Hewitt?

23           MR. DUPONDE:  Objection.

24       Mischaracterizes her testimony.

25           THE WITNESS:  Around the same time was

1          when Bob was also concerned about Steve

2          Lawson spending so much time on setting up

3          Matt's computers.  Then came the dispute

4          where David Prather was demoted.  So there

5          came a need for Dave to earn more money and

6          also to find other permanent employment.  So

7          Bob was saying it would be great if Dave can

8          work for Matt because, you know, Steve

9          doesn't have the time to do all -- everything

10         for Matt whereas Dave is equally competent in

11         terms of programming projects and that, you

12         know, it would be a great match.

13    BY MR. WOHL:

14         Q    Okay.  Do you know why Dave Prather was

15    demoted?

16              MR. DUPONDE:  Objection.  Calls for

17         speculation.

18              THE WITNESS:  Yes, because his

19         exgirlfriend showed up at work.

20    BY MR. WOHL:

21         Q    This was the domestic issue you referred

22    to earlier?

23         A    Oh, yes, in February it happened once and

24    then another in May.

25         Q    And the next -- the second part of your

1    response I believe was that Mr. Schleifer thought

2    it would be great if Mr. Prather could work for

3    Matt Hewitt.  Did Mr. Schleifer tell you that it

4    would be great if he could work for Matt Hewitt

5    after leaving CCI or while still employed at CCI?

6        A    While still employed with CCI.

7        Q    Did Mr. Schleifer express to you any

8    concern that Mr. Prather would be working for two

9    job -- or two employers at the same time?

10       A    No.  Bob is very encouraging in terms of

11   setting up your own business and being independent.

12   He's very supportive of employees having their side

13   businesses or doing things to enhance their careers

14   and independence.  So he -- I think he was giving a

15   lot of encouragement to Dave because he understood

16   that he was in a bad situation in terms of family

17   life and that this is a good chance for him to

18   start his company and make more income as well as

19   if he finds permanent employment he will be leaving

20   CCI.

21       Q    Permanent employment with Pacific Crest?

22       A    Not necessarily.  I think what Bob was

23   recommending was that he be an independent

24   contractor or outsourcing source for programming so

25   he could have his own company.

1        Q     Okay.  Did Mr. Schleifer ever express to

2    you any concern about Mr. Prather working for a

3    company that was doing the same kind of business

4    that CCI was doing?

5        A     No.

6        Q     Did Mr. Schleifer ever refer to Pacific

7    Crest or Matt Hewitt as a competitor?

8        A     At one time, yes.

9        Q     What context did that come up?

10       A     When we were discussing the possibility

11   of outsourcing work to Pacific Crest.  Once we

12   found out that Matt had his own phone center and

13   was starting things up we were happy that -- both

14   Bob and I were happy that, well, Matt is somebody

15   we can trust to do phone operations, therefore, it

16   would be a great place to outsource work and -- but

17   not have the financial liability of keeping the

18   center open.  And then sometime after that he

19   mentioned that, well, we would have to be careful

20   on which projects we out sourced and we should only

21   outsource established clients with CCI.

22       Q     Explain to me what your understanding of

23   the term outsourcing means in this business.

24       A     Oh.  Outsourcing is when a company

25   receives a request for a project that requires more

1   hours on the telephone than the company can

2   provide.  They would outsource that -- a part or

3   all of the project to a different company phone

4   center that can handle the work.  It's

5   subcontracting.

6        Q    Okay.  If CCI out sources work to another

7   phone bank, does CCI then get paid from the client

8   based on the work that the subcontractor does?

9        MR. DUPONDE:  Objection.  Calls for

10        speculation.  Vague.  Ambiguous.

11   BY MR. WOHL:

12        Q    You can answer.

13        A    Okay.  The contract to do the work still

14   stays with CCI and the client.  CCI is responsible

15   for making sure the other company does everything

16   that is up to par with CCI's level of work as well

17   as all the project management aspect of the contact

18   with the other phone vendor.  So typically we would

19   hope that the other vendor has a lower price than

20   we are charging our clients but sometimes it's the

21   same price.

22        Q    Okay.  When the price -- that is the work

23   you're outsourcing -- when the price is lower, does

24   CCI then get to keep --

25        A    Yes.

```
 1        Q     -- whatever difference in what they

 2    billed the client and what they're charged by the

 3    subcontractor?

 4             MR. DUPONDE:  Objection.  Calls for

 5        speculation.  Vague and ambiguous.

 6             THE WITNESS:  Yes.

 7    BY MR. WOHL:

 8        Q     Is that how it was when you worked at

 9    CCI?

10        A     As I priced many projects, so I'm

11    familiar with the pricing and how the revenue gets

12    distributed.

13        Q     And you testified that Mr. Schleifer

14    discussed with you CCI's desire to outsource

15    certain work to Pacific Crest, correct?

16        A     Yes.

17        Q     And you stated that because Matt Hewitt

18    is somebody that Bob Schleifer can trust?

19        A     Yes.

20        Q     Would there -- do you know what Matt

21    Hewitt was charging per hour on jobs back in 2003?

22             MR. DUPONDE:  Calls for speculation.

23    BY MR. WOHL:

24        Q     You can answer.

25        A     Okay.  Yes.  Much lower than what CCI was
```

1    charging.  We understood that Matt was a one man

2    operation at his phone center so, therefore, he had

3    lower overhead.  So, therefore, CCI can guess what

4    his bottom line is.  So, therefore, if we outsource

5    to him we would be able to say, we'll give you this

6    work for so and so amount, which would be

7    considerably lower than what we are charging CCI

8    clients.

9        Q    Okay.

10       A    It would be a benefit to CCI because we

11   know what his operating costs are --

12       Q    Okay.  I think you also testified that

13   the outsourcing involves giving the call center --

14   or strike that.

15            Outsourcing is giving the surveys to a

16   call center to do the actual calling, correct?

17       A    Yes.

18       Q    But that CCI would then manage the

19   project?

20       A    Right.  Sometimes part of the project

21   will run CCI and we will outsource a part of it to

22   the other company.

23       Q    Okay.  Did Mr. Schleifer ever discuss

24   with you certain clients that he was considering

25   outsourcing to Pacific Crest back in 2003?

```
 1        A     Yes.

 2        Q     Which clients did he mention?

 3        A     Binder Research, John Ancelone

 4   (phonetic).

 5        Q     Any others?

 6        A     There may have been but I don't recall

 7   specifically.

 8        Q     Did Mr. Schleifer give any reason to you

 9   why he thought those two clients in particular

10   would be some -- would be clients that he would

11   want to outsource to Matt Hewitt?

12             MR. DUPONDE:  Calls for speculation.

13             THE WITNESS:  Well, Bob told me that

14        Binder would be good because he's a west

15        coast client and currently we -- at the time

16        we didn't have a client services manager

17        servicing the west coast and had some

18        difficulty with managing west coast clients.

19        So he thought, oh, well, that would be a good

20        client for Matt to do since he's on the west

21        coast and can respond in a timely manner,

22        things like that, after hours.

23             In terms of JAR --

24   BY MR. WOHL:

25        Q     You said JAR?
```

1    A    Oh, John Ancelone Research.

2    Q    Ancelone?

3    A    Yeah, JAR was just the acronym we used at

4    CCI.

5    Q    Okay.  And did Mr. Schleifer tell you why

6    he believed that Ancelone Research would be a

7    client that they would want to outsource to Pacific

8    Crest and Matt Hewitt?

9    A    JAR was a very difficult client.  They

10   always had last minute bid requests, last minute

11   booking, demanding for lots of hours on the

12   schedule yet turning around and canceling the last

13   minute, as well as they were very price sensitive

14   and always haggled on price.

15         So based on the fact that there was lots

16   of client services, you know, hours put into these

17   projects with lower revenue per hour sometimes we

18   joke that, hey, we should just send them off to

19   Pacific Crest and let Matt deal with all the issues

20   that come up with managing their projects and we

21   should just back out of the whole things because

22   it's not worth our time.

23   Q    Was this -- in your opinion, by

24   outsourcing the Ancelone business, would CCI then

25   be able to at least then make some money from the

1    clients without having to deal with the problems

2    you had just gone through?

3            MR. DUPONDE:  Calls for speculation.

4            THE WITNESS:  In terms of JAR that was to

5        give the whole client away.

6    BY MR. WOHL:

7        Q    Okay.

8        A    It was not about us managing because that

9    was the part that was taking too long and too much

10    effort.  So we were just going to say, you know,

11    stop working for CCI, put it over to Matt or

12    wherever else you want to go to.

13        Q    I see.  Okay.  Are you aware if Matt

14    Hewitt and Pacific Crest at some point began doing

15    work for Binder Research?

16            MR. DUPONDE:  Calls for speculation.

17            THE WITNESS:  I do not know specifically

18        when they started doing work for Binder

19        Research.

20    BY MR. WOHL:

21        Q    Are you aware if Pacific Crest did any

22    Binder jobs while you were -- while you were still

23    employed at CCI?

24        A    No.

25        Q    Are you aware if anybody at CCI,

1    including Steve Lawson and Dave Prather, assisted

2    Matt Hewitt with any Binder programming during the

3    time that Mr. Prather and Mr. Lawson were employed

4    at CCI?

5           MR. DUPONDE:  Calls for speculation.

6        Foundation.

7           THE WITNESS:  Bob told me that Steve

8        Lawson had programmed Binder project I guess

9        as --

10   BY MR. WOHL:

11       Q    Bob Schleifer told you that Steve Lawson

12   had programmed a Binder project?

13       A    For Matt Hewitt.

14       Q    Okay.  And did Mr. Lawson tell you that

15   Mr. --

16       A    Mr. Lawson didn't.

17       Q    Did Mr. Schleifer tell you that

18   Mr. Lawson programmed a Binder job for Matt Hewitt

19   during the time that Mr. Lawson was employed by

20   CCI?

21       A    Yes, in the same context of him spending

22   time at work doing work for -- at -- time working

23   for CCI and working for Matt at the same time.

24       Q    Did you express any concern to

25   Mr. Schleifer about the fact that Mr. Lawson was

1   employed by CCI was programming the Binder job

2   for --

3       A    No.

4       Q    -- Pacific Crest?

5       A    No.

6       Q    Did you ever discuss with Bob Schleifer

7   any concerns that you had that CCI was helping Matt

8   Hewitt which was a competitor of CCI?

9       A    At one point Bob did say that we should

10  only outsource established clients to Matt when the

11  outsourcing contract or agreement becomes official

12  and we start giving Matt work.  He was concerned

13  that with established clients there's client

14  loyalty and they trust CCI to do a good job and,

15  therefore, would allow us to out -- manage the

16  outsourcing company, whereas with a brand new

17  client they have less of a loyalty.  So if they

18  realize that this other company was actually

19  dialing on their project they may go around CCI and

20  go directly to Matt.

21      Q    Okay.  You said in your response you

22  talked about an outsourcing agreement?

23      A    Uh-huh.

24      Q    What is that?

25      A    It's not an official document or anything

1    but we would have phone conversation with different

2    vendors saying if we were to outsource work for you

3·   how many dollars an hour would you charge or some

4    sort of agreement where it said, okay, we have some

5    new projects coming up and we're thinking of using

6    you, that type of agreement assumes that the phone

7    center is ready and willing to receive work from

8    CCI.

9         Q    Okay.  What kind of work do you know was

10   Dave Prather doing for Pacific Crest during the

11   time that he was employed by CCI?

12             MR. DUPONDE:  Calls for speculation.

13        Foundation.

14             THE WITNESS:  He was programming all the

15        projects that ran at Pacific Crest.

16   BY MR. WOHL:

17        Q    And was he programming projects that --

18   for Pacific Crest during the time he was still

19   employed by CCI?

20        A    Yes.

21        Q    And do you know if Mr. Schleifer was

22   aware that Mr. Prather was programming projects for

23   Pacific Crest during the time that he was employed

24   by CCI?

25             MR. DUPONDE:  Calls for speculation.

```
 1              THE WITNESS:  Oh, yes.

 2   BY MR. WOHL:

 3        Q    How do you know that?

 4        A    He was always -- he was very encouraging

 5   of the fact to begin with and then when Dave

 6   actually started doing programming Bob was very

 7   proud that Dave had taken his first steps towards

 8   independence and he was very glad that Steve Lawson

 9   had no longer had to do the programming and Dave

10   was able to make extra money.

11        Q    When you say he was -- that Mr. Schleifer

12   was proud that Dave Prather had taken steps towards

13   independence, how do you know that?

14              MR. DUPONDE:  Calls for speculation.

15              THE WITNESS:  He spent -- Bob spent a lot

16        of time talking with Dave about the

17        importance of financial independence,

18        entrepreneurship and establish his place in

19        society in terms of his career and he said

20        that working for Matt is a very good

21        opportunity and that he should, you know,

22        immediately jump onto it.

23              David Prather is more of a -- kind of a

24        follower and he really doesn't like to muddy

25        the water, so he was reluctant, but Bob, you
```

1          know, made sure that they got in contact with

2          each other and got -- you know, start to work

3          -- Dave start to work for Matt.

4               MR. DUPONDE:  Move to strike.

5          Speculation.

6     BY MR. WOHL:

7          Q    Your testimony, I want to make sure I'm

8     clear on this, this is something that you're

9     hearing from Dave Prather?

10         A    Yes, and I have heard directly from Bob.

11         Q    I want to focus on what Mr. Schleifer

12    told you directly.  Can you tell me what you recall

13    Mr. Schleifer telling you about Dave Prather doing

14    programming work for Pacific Crest and Matt Hewitt

15    during the time that Mr. Prather was employed by

16    CCI.  What did Mr. Schleifer tell you?

17         A    Bob said that he -- that's what he's

18    recommending Dave do and that he really wanted this

19    agreement to work and he really thinks that it's a

20    good idea for Dave to work for Pacific Crest.

21         Q    Now, you and Mr. Prather are romantically

22    involved?

23         A    Yes.

24         Q    And you were at the time when this was

25    occurring back in summer and spring of 2003?

1   day to day contact and AAA, all they have to do is

2   provide them the questionnaire and sample and say,

3   hey, please field this, how much would it be.  So I

4   saw that.  And in combination with the fact that

5   Dave was, you know, doing relatively well in terms

6   of having projects to do and, you know, it was

7   working out really well so -- and in part is, yes,

8   I would like to be independent one day also.

9        Q    So in this time period, July 22, 2003,

10  Mr. Prather was doing well in terms of the work he

11  was doing for Pacific Crest?

12       A    He was busy, yes.

13       Q    How many jobs or projects had Mr. Prather

14  worked on prior -- for Pacific Crest prior to you

15  sending this email?

16       A    I'm not sure.  Projects are very

17  seasonal.  They come and go.  And I just know that

18  I couldn't visit him on certain times because he

19  was busy programming or doing data processing.  I

20  can't tell you a number because I really don't

21  know.

22       Q    During this time period, did you have an

23  understanding of how Pacific Crest was doing

24  generally, how busy they were?

25       A    No, not really.

1    bottom right hand corner AAAACS document seven and

2    it's an email exchange -- at least if you start in

3    the middle of the page, email exchange between you

4    and Mr. Prather dated July 25, 2003.  Do you recall

5    having an email exchange with Mr. Prather?

6        A    Yes.

7        Q    In that email exchange Mr. Prather is

8    stating to you or at least making a reference to

9    something you had said to him about the CCI web

10   site.  Do you see that?  If you could please read

11   what Mr. Prather wrote to you.

12       A    Here you go.  I don't know what you're

13   talking about with the CCI web site.

14       Q    What is he referring to there?

15           MR. WOHL:  Objection.  Calls for

16       speculation.

17           THE WITNESS:  I am not sure how that has

18       to do with my -- the email that I sent him.

19       I don't recall what he was referencing to.

20   BY MR. DUPONDE:

21       Q    Let's talk about the email that you sent

22   to him.  You're asking for some information there,

23   what are you asking for?

24       A    The -- a data file and layout file which

25   has the formatting that was specific to certain

# EXHIBIT B

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

COMMUNICATIONS CENTER, INC.,

a District of Columbia

Corporation,

      Plaintiff,

      vs.

MATTHEW J. HEWITT, an

individual; PACIFIC CREST

RESEARCH CORPORATION, a

Washington corporation,

      Defendants.

_____/

**CERTIFIED COPY**

No. CIV.S-03-1968 WBS KJM

Deposition of

MATTHEW J. HEWITT

Wednesday, September 29, 2004

VOLUME I, Pages 1 to 236

Reported by:

SHARON CABELLO, RPR

CSR No. 3080

Job No. 45778

1    My laptop, Michael's computer, and the server.

2    Q.        The Sun server?

3    A.          No, no.  There was no documents on that at

4    all.  It's the server that is similar to the desk top

5    that's not quite a desk top.

6    Q.        The one you describe as desk top-ish?

7    A.          Yes.

8    Q.        Okay.  Now, what about the Dell desk top that

9    you used to use that you purchased in December of 2002?

10   A.          It does not work.

11   Q.        It does not work?

12   A.          No, which produced the need to have another

13   computer.

14   Q.        Was any attempt to make a mirror image of that

15   made?

16   A.          No.  Everything was pulled off of the old hard

17   drive and put on my laptop.

18   Q.          I see.  So the Dell laptop when you purchased

19   it, or at some point in time after you purchased it,

20   you transferred information from the Dell desk top that

21   you used to use to the Dell laptop that you use now?

22   A.          Correct.

23   Q.          I see.  So there is no information on the

24   supervisor stations that would be pertinent to the

25   litigation?

Esquire Deposition Services
1801 I Street, First Floor, Sacramento Ca, 95814          (916) 448-0505

1   roughly?

2          MR. WOHL:  Objection, vague and ambiguous.

3   Q.       MR. DAPONDE:  When did Max come in and do what

4   he did?

5   A.       Sometime in the last three months.  I have no

6   idea.

7   Q.       Was it around July of 2004?

8   A.       It may have been.  I have no idea.

9   Q.       And Ed came in after Mac?

10   A.       Yes.

11   Q.       So Mac was responsible for creating two of the

12   mirrors and Ed was responsible for creating one of the

13   mirrors, correct?

14   A.       Correct.

15   Q.       Okay.  Did they create these mirrors at your

16   business address, at Pacific Crest's business address?

17   A.       Yes.

18   Q.       Prior to the mirrors being created, did you

19   remove any documents or files from any of the three

20   hard drives?

21   A.       That pertain to this case?  No.

22   Q.       No, did you remove any documents or files on

23   any of the three hard drives?

24   A.       On my laptop, yes.

25   Q.       Did you?

34

1  A.        Yes.

2  Q.        What did you remove from the hard drive?

3  A.        Personal and private information.

4  Q.        Did you read the Order requiring you to make

5  the mirror images of the hard drives?

6  A.        I am sure I did, but I don't recall what it

7  said.

8  Q.        Do you recall the Order providing -- allowing

9  you to remove personal or private information from the

10  hard drives before making the mirror images?

11        MR. WOHL:  Objection, lacks foundation.

12  Q.        MR. DAPONDE:  We can get a copy of the Order

13  in here on a break.  But I am just curious as to what

14  was your reason for removing information in the face of

15  the Order?

16        MR. WOHL:  Objection, lacks foundation and the

17  question has been asked and answered.

18        You can answer.

19        THE WITNESS:  From my understanding the only

20  thing that I needed to produce was anything that was

21  pertinent to this case, and personal and private

22  information is not pertinent to this case.

23  Q.        MR. DAPONDE:  How many documents or files did

24  you remove from your laptop?

25  A.        I don't know.

35

1  A.        I produced everything that was pertinent to

2  this case and CCI.

3  Q.        How did you make the determination of what was

4  or was not pertinent?

5  A.        If it was personal in nature that had to do

6  with my private life, that had nothing to do with CCI

7  or this case.

8  Q.        How long did it take you to remove personal

9  and private information from your laptop before you

10  made the mirror image?

11  A.        I have no idea.  I can't sit down and do any

12  one thing from beginning to end.

13  Q.        How did you remove this information?

14  A.        I used Windows to delete Internet histories,

15  and then there was a program that was used to remove

16  any of the items that were removed.

17  Q.        What was the program that was used?

18  A.        I have used Evidence Eliminator and SOAP,

19  which they are both to scrub a hard drive.

20  Q.        You used something called Evidence Eliminator?

21  A.        Yes, sir.

22  Q.        How many files did you remove with Evidence

23  Eliminator?

24        MR. WOHL:  Objection, asked and answered.

25        THE WITNESS:  I don't know.

Esquire Deposition Services
1801 I Street, First Floor, Sacramento Ca, 95814        (916) 448-0505

1  them from there, taking other types of documents,

2  putting them in the trash bin and removing them from

3  there, how long did that take you?

4  A.      I don't have any idea.  Like I said, I can

5  never do one thing from beginning to end.  It would

6  have been an ongoing process.

7  Q.      Was it a couple of hours, was it 30 hours?

8  A.      I do not know.  There is times where I sit at

9  my computer for five minutes, there is times I can sit

10  there for a half hour.

11  Q.      Does Evidence Eliminator have any function

12  where you can just tell it what to go look for?

13  A.      Not that I am aware of.

14  Q.      So you have to do -- so there is some area of

15  the hard drive that Evidence Eliminator will go in and

16  clean out, so to speak, so you just have to get

17  everything you want cleaned out into that area of the

18  hard drive; is that accurate?

19  A.      To the best of my knowledge, yes.  I'm not a

20  computer expert by any means.

21  Q.      So then once it's there, Evidence Eliminator

22  just does its job, it's not like Evidence Eliminator

23  goes and picks and chooses from other parts of your

24  computer, right?

25  A.      I don't believe so, no.

1  A.       Yes.

2  Q.       Why did you do it several times?

3  A.       Kind of like a new toy, trying to figure out

4  how things work.   Trial and error process, what is it

5  doing.

6  Q.       As you sit here today, how can you be certain

7  that Evidence Eliminator did not eliminate evidence

8  relative to this litigation?

9         MR. WOHL:  Objection, asked and answered.

10  Q.       MR. DAPONDE:  You can answer.

11  A.       I did not eliminate anything pertaining to

12  this case, and it specifically only cleans things that

13  are deleted in some form or another, either from

14  Windows doing it, from an automatic deletion process of

15  Internet histories, or from the trash bin.  And no

16  documents that pertain to this case were ever put into

17  that trash bin.

18  Q.       All right.  But you talked about Internet

19  histories and how those are cleaned out regularly by

20  Windows, correct?  Is that right?

21  A.       Yes, that's correct.

22  Q.       And I think you said that when they are

23  cleaned out by Windows they leave pieces; is that what

24  you said?

25  A.       I believe so.

59

1    Q.        And then Evidence Eliminator comes in and

2    cleans out the pieces, right?

3    A.        Correct.

4    Q.        So if there were pieces somewhere on your hard

5    drives that pertained to accessing CCI's Web site,

6    CCI's secured network, any Internet history of that

7    particular hard drive accessing CCI's Web site or

8    network would have been swept out by Windows and turned

9    into pieces at some point in time, correct?

10   A.        Correct.

11             MR. WOHL:  Objection, calls for speculation.

12   Q.        MR. DAPONDE:  And then those pieces would have

13   been eliminated by Evidence Eliminator, correct?

14             MR. WOHL:  Objection, lacks foundation, calls

15   for speculation.

16             THE WITNESS:  Correct.

17   Q.        MR. DAPONDE:  Okay.  Now, I just want to ask

18   some very specific questions.  Were any files

19   pertaining to David Binder eliminated by Evidence

20   Eliminator?

21   A.        No.

22   Q.        Were any files pertaining to Kiley & Company

23   eliminated by Evidence Eliminator?

24   A.        No.

25   Q.        Were any files pertaining to Ann Seltzer

61

```
 1  eliminated by Evidence Eliminator?

 2  A.        No.

 3  Q.        Were any files pertaining to Anzalone

 4  eliminated by Evidence Eliminator?

 5  A.        No.

 6  Q.        Were any files pertaining to Pacific Crest's

 7  pricing or bidding eliminated by Evidence Eliminator?

 8  A.        No.

 9  Q.        Were any files pertaining to client lists or

10  prospect lists eliminated by Evidence Eliminator?

11            MR. WOHL:  Objection, lacks foundation.

12            THE WITNESS:  No.

13  Q.        MR. DAPONDE:  Were any of those files that I

14  have just listed eliminated by SOAP?

15  A.        No.

16  Q.        So it's your testimony that only files not

17  pertaining to this litigation were eliminated by SOAP

18  and/or Evidence Eliminator?

19            MR. WOHL:  Objection, asked and answered.

20            THE WITNESS:  Correct.

21  Q.        MR. DAPONDE:  And it's your testimony that you

22  have no idea how many such files were eliminated by

23  SOAP and/or Evidence Eliminator, correct?

24            MR. WOHL:  Objection, asked and answered.

25            THE WITNESS:  Correct.
```

62

1  Q.       What did you do for a collection agency?

2  A.       I started out as a collector and became the

3  office manager.

4  Q.       As office manager did you run a phone center?

5  A.       Yes.

6  Q.       Was that your first phone center experience

7  working for the collection agency?

8  A.       Yes.

9  Q.       How long did you work for the collection

10 agency?

11 A.       About two and a half years.

12 Q.       Where did you go from there?

13 A.       CCI.

14 Q.       Okay.  And do you recall when you were hired

15 by CCI?

16 A.       '99, sometime in '99.

17          MR. DAPONDE:  Mark this next one Exhibit 3.

18          (Plaintiff's Exhibit 3 was marked

19          for identification.)

20          THE WITNESS:  May 17th of '99.

21 Q.       MR. DAPONDE:  Mr. Hewitt, I have just handed

22 you a document that's been labeled Exhibit 3.  It is a

23 CCI document, it's entitled Confidentiality Agreement

24 with your name and address on it and a signature.

25          Is that signature at the bottom yours?

1  A.        Yes.

2  Q.        And it's dated May 17th, 1999, correct?

3  A.        Yes.

4  Q.        Seeing this document, does that refresh your

5  recollection as to when you started at CCI?

6  A.        Yes.

7  Q.        So was it sometime around May 17th of '99?

8  A.        Yes.

9  Q.        Okay.  Now, you signed this document entitled

10 Confidentiality Agreement.  If you could just take a

11 moment and read it, I would like to ask you some

12 questions about it.

13 A.        Okay.

14 Q.        Was anybody from CCI present when you read and

15 signed this contract, this agreement?

16 A.        I don't recall.  I don't recall.

17 Q.        Did anybody from CCI explain to you any aspect

18 of this Confidentiality Agreement?

19 A.        No.

20 Q.        Okay.  When you signed this agreement what was

21 your understanding of what it meant?

22 A.        That the surveys were not to be discussed.

23 Q.        Did you have an understanding of what the

24 surveys were at that time?

25 A.        What you did on the telephone.

79

1  Q.       How did you gain that understanding of what a

2  survey was?

3  A.       That's what a survey is.

4  Q.       How did you gain that understanding?

5  A.       From everybody that worked there, from

6  everybody that I talked to, and the survey was what you

7  did on the telephone.

8  Q.       Okay.  How about prior to signing this

9  agreement, I think did you start right around the 17th

10  of May?

11  A.       This probably would have been my first day.

12  Q.       So this was your first day.  So at the time

13  that you signed this had anybody explained to you what

14  surveys were?

15  A.       What they did on the telephone.

16  Q.       And what exactly -- how was that explained to

17  you?

18  A.       Read verbatim what's on the screen.

19  Q.       Let me back up for a minute.  When you were

20  hired what position were you hired for?

21  A.       Assistant Director of Operations.

22  Q.       In your prior collection agency job was there

23  a script that you were required to follow?

24  A.       No.

25  Q.       So each phone call was unscripted?

80

1           MR. WOHL:  Objection, vague and ambiguous as

2    to "script."

3           THE WITNESS:  Yeah, I was --

4    Q.        MR. DAPONDE:  Do you understand what a script

5    is?

6    A.        Well, there is -- in collections you have to

7    follow guidelines that you can't do this and you can't

8    do that.  But other than that it was --

9    Q.        You were free to say whatever words you wanted

10   within those guidelines?

11   A.        Yes.

12   Q.        At CCI were you free to say whatever words you

13   wanted?

14   A.        No, you had to read the survey.

15   Q.        And is your understanding of what you had to

16   read -- is your understanding that that's called a

17   script?

18   A.        No, it's called a survey.

19   Q.        Has it ever been called a script in your

20   experience?

21   A.        By the programmers.

22   Q.        Programmers called it a script?

23   A.        Occasionally.  It's called a survey, When am I

24   going to get the survey?  It just depends on what their

25   background was, where they came from.

81

1  "Commission Structure" and then it goes on I think page

2  6 is where it starts to talk about percentages, and so

3  forth.

4         But look at page 4 through the end and tell me

5  if this is your understanding of how commissions were

6  to be paid.

7  A.      Yes, this looks familiar.

8  Q.      At the time that you became Account Exec did

9  it seem reasonable that you would be able to achieve a

10 minimum of 25,000 in annual commissions such that you

11 would be able to zero out your draw?

12 A.      When the position was presented to me with the

13 client assignments that I had it seems reasonable, yes.

14 Q.      Now, going back, flipping back to the first

15 page, the other points on the first page discuss what

16 CCI was going to provide to you cell phone, phone

17 service, two lines, Internet access, laptop computer,

18 printer and fax machine.  Do you see that?

19 A.      Yes.

20 Q.      I am going to talk about some laptop computer

21 issues.

22         Mark this as next.

23         (Plaintiff's Exhibit 9 and 10 were marked

24         for identification.

25 Q.      MR. DAPONDE:  We have just handed you Exhibits

1   A.        Correct.

2   Q.        Did you run both Call Centers from Spokan?

3   A.        Define "Call Center."  If that definition

4   means an empty building with seats it in, yes.

5   Q.        What do you mean by that?

6   A.        We downsized Florida to virtually nothing very

7   quickly after I became Director of National Operations.

8   Q.        So there wasn't a Call Center, so to speak, to

9   run in Lakeland?

10  A.        No, there wasn't enough work to put people in

11  the seats in Lakeland.

12  Q.        So roughly how many seats were filled in

13  Spokan versus Lakeland at that time?

14  A.        Zero --

15            MR. WOHL:  Spokan.

16            THE WITNESS:  January?  You asked for --

17  repeat your question one more time.

18  Q.        MR. DAPONDE:  How many seats in Spokan were

19  filled with interviewers on a regular basis versus how

20  many seats in Lakeland were filled?

21  A.        I can't even venture to guess how many were

22  being sat in Spokan at the time.

23  Q.        But your testimony was that Lakeland was down

24  to practically zero?

25  A.        At this specific time there were still people

1  in the center and by -- sometime in the first quarter

2  it was empty.

3  Q.      You were Director of National Operations for a

4  little more than a year, correct, before you

5  transitioned to Account Executive?

6  A.      Yes.

7  Q.      And at that point during that year, year and a

8  half, time period, you moved from Spokan, Washington, to

9  Northern California, correct?

10 A.      Correct.

11 Q.      When was that?

12 A.      First month or two into 2002.

13 Q.      Okay.  Why did you move to Northern

14 California?

15 A.      My wife was transferred.  She is active duty

16 Air Force and she was transferred from Washington to

17 California.

18 Q.      I see.  And you continued your duties as

19 Director of National Operations from Northern

20 California, correct?

21 A.      Correct.

22 Q.      When you physically moved from Washington to

23 California did you think that it would be difficult to

24 continue to be Director of National Operations from a

25 location where there wasn't a CCI phone center?

116

1  to run a company like that.  It's stupid the way it's

2  set up, there is so much overhead, it's just foolish.

3  Q.      When roughly did you start having these types

4  of conversations with your CCI employees?

5  A.      I don't recall.

6  Q.      Was it during 2001 before you moved to

7  California?

8  A.      I had them when I was Assistant Director, how

9  this is the easiest thing in the world, I can't believe

10 that we are being paid to do this.  I mean, it's not

11 rocket science.

12 Q.      Which part is not rocket science?

13 A.      Running a Call Center and data collections,

14 it's not rocket science.

15 Q.      What about the part about getting people to

16 hire you to do that?

17 A.      It's a commodity, everybody does it exactly

18 the same way.  There is no difference between how

19 Pacific Crest collects data, CCI, Directions in

20 Research, or anybody else that's in the business.  So

21 it's not rocket science.

22 Q.      Do you in your business -- strike that.

23         Is it a relationship business -- would you

24 call it a relationship business with clients?

25 A.      Some of them, depends on the client.  Some of

119

1  "Commission Structure" and then it goes on I think page

2  6 is where it starts to talk about percentages, and so

3  forth.

4        But look at page 4 through the end and tell me

5  if this is your understanding of how commissions were

6  to be paid.

7  A.        Yes, this looks familiar.

8  Q.        At the time that you became Account Exec did

9  it seem reasonable that you would be able to achieve a

10  minimum of 25,000 in annual commissions such that you

11  would be able to zero out your draw?

12  A.        When the position was presented to me with the

13  client assignments that I had it seems reasonable, yes.

14  Q.        Now, going back, flipping back to the first

15  page, the other points on the first page discuss what

16  CCI was going to provide to you cell phone, phone

17  service, two lines, Internet access, laptop computer,

18  printer and fax machine.  Do you see that?

19  A.        Yes.

20  Q.        I am going to talk about some laptop computer

21  issues.

22        Mark this as next.

23        (Plaintiff's Exhibit 9 and 10 were marked

24        for identification.

25  Q.        MR. DAPONDE:  We have just handed you Exhibits

1  talked to Bob Schleifer on occasion about her warm

2  personality.

3  Q.        Turning to the next exhibit, the letter from

4  Bob to you dated September 27th, 2002, have you seen

5  this letter before?

6  A.        Yes.

7  Q.        Was this letter sent to you by Bob around

8  September 27th of 2002?

9  A.        Yes.

10  Q.        And was this date on the letter as you look at

11  it, was this around the time that you had these

12  conversation with Bob, or did the letter follow a week

13  or two later?

14  A.        I don't recall.

15  Q.        Okay.  And if you look in the letter about the

16  fourth line in the first paragraph it says, "You

17  courageously confirmed this to be the case yesterday on

18  the phone."

19         Does that refresh your recollection as to when

20  you had the conversation with Bob in which you admitted

21  what you were doing?

22  A.        Assuming that the date was correct, it would

23  have been the 26th of September.  But I don't recall --

24  I recall it being early September, but.

25  Q.        The second paragraph says, "Since you are

1  currently in possession of Communications Center

2  property, your last paycheck will be held until all

3  property has been received by the Spokan office.

4  Specifically, the laptop computer along with all the

5  software and software documentation, documents created,

6  and leads generated during your employ, company

7  provided fax/printer and the company cell phone.

8  Please make shipping arrangements with Steve Lawson."

9         Do you recall -- strike that.

10         When you read this, did you begin gathering

11  these items to send to Steve Lawson?

12         MR. WOHL:  Objection, lacks foundation.

13         THE WITNESS:  Right there laptop, fax,

14  printer, boxed stuff up, sent it on its way.

15  Q.      MR. DAPONDE:  So what did you send to Steve

16  Lawson?

17  A.      Laptop, fax printer and cell phone.

18  Q.      What about the software?

19  A.      Software came on the laptop, it was a CD that

20  went, as well.

21  Q.      So you sent the CD back, too?

22  A.      Yes.

23  Q.      What about any documents created?

24         MR. WOHL:  Objection, lacks foundation.

25         THE WITNESS:  I didn't have any physical

Esquire Deposition Services
1801 I Street, First Floor, Sacramento Ca, 95814          (916) 448-0505